# CASES

## IN THE

# SUPREME COURT OF ALABAMA,

## DECEMBER TERM, 1884.

## McDaniel *v.* The State.

### *Indictment for Murder.*

1. *Judicial knowledge of deadly or dangerous wound.*—That a fracture of the skull may produce death, but does not necessarily have that effect in every case, is matter of common knowledge.

2. *Causal relation between blow or wound and subsequent death.*—When the wound is in its nature mortal, or likely to produce death, "the doctrine is established, that it is sufficient if the blow caused the death, though the deceased might have recovered if he had taken proper care of himself, or had submitted to a surgical operation, which he refused to do, or if the surgeon had treated the wound properly;" and it is a corollary from this principle, that if the death resulted partly from a blow wrongfully given which might produce death, and partly from neglect or unskillful treatment, the assailant is guilty of the homicide in the degree which the attendant circumstances may assign to the act.

3. *Self-defense; burden of proof.*—To establish the plea of self-defense, it is enough for the defendant to show that at the time he was, either really or to ordinary appearance, in imminent peril of life or limb, and had no other reasonable means of escape; and though he can not invoke this defense when he himself provoked or encouraged the difficulty, the *onus* is not on him to prove this negative.

4. *Impeaching and sustaining witness.*—It is not permissible to adduce evidence to sustain the credibility of a witness, as by showing that his testimony before the committing magistrate was substantially the same as on the trial, unless an attempt has been made to impeach it.

5. *Foreman's signature, as indorsed on indictment.*—It is not a valid objection to an indictment, that the name of the foreman of the grand jury, as indorsed thereon, is spelled *J. H. Karter*, while in the minute-entries it is spelled *John H. Carter.*

6. *Service of copy of indictment, omitting indorsements.*—The defendant can not object to going to trial, on the ground that a copy of the indictment had not been served on him as required by an order of the court (Code, § 4872), when the only objection to the copy served is on account of the omission of certain indorsements on the original, showing the issue of writs of arrest and the names of the witnesses.

1

FROM the Circuit Court of Cullman.

Tried before the Hon. LEROY F. Box.

The defendant in this case, Charles McDaniel, was indicted for the murder of Benjamin Anderson, "by striking him with an iron weight;" pleaded not guilty to the indictment, but was convicted of manslaughter in the first degree, and sentenced to the penitentiary for the term of three years and six months. A bill of exceptions was reserved on the trial, which states that the defendant, before announcing whether he was ready for trial, "objected to being put upon his trial, because a copy of the indictment had not been served on him or his counsel, as ordered by the court; and on this objection being made, it was shown to the court that a copy of the indictment, with some of the indorsements thereon, but without certain other indorsements thereon, was properly served, the omitted indorsements being as follows"—viz., the issue of several writs of arrest, with the dates of each, and the names and residences of the several witnesses. "Upon this showing, the court overruled the defendant's said objection, and required him to announce whether he was ready for trial; and to this action of the court the defendant duly excepted. The defendant also moved the court, before entering on the trial, to quash the indictment, because the name of the foreman of the grand jury, as indorsed on said indictment, was *J. H. Karter*, while the name of the foreman of the grand jury at that term, as shown by the minute-entries of the court, was *John H. Carter*. The court overruled this motion, and the defendant duly excepted."

"On the trial, the State offered evidence tending to prove that the deceased came to his death from the effects of a wound caused by an iron weight thrown at him by the defendant; that such wound was inflicted in said county of Cullman, about January 8th, 1881, and that the death of the deceased occurred on or about February 22d, 1881. As to whether the blow with the iron weight was the cause of the death, the evidence was conflicting throughout. The skull of the deceased was produced, showing a fracture of the frontal bone, over and back of the left eye, between one and two inches long, and about a half inch wide at the widest point. This fracture was complete, leaving an opening in the frontal bone about one and a half inches long, by half an inch wide. When the skull was exhumed, a few days before the trial, the piece of bone from the opening was in place, but slightly depressed, or fallen in at the upper part. At the base of the fracture in the frontal bone there was an inward depression in the parietal bone, about a quarter of an inch in depth, and half an inch wide. When the blow was struck, the deceased, without saying a word, walked out of the saloon, in search of a physician, had the

[McDaniel v. The State.]

wound examined by the physician, and then went home, a distance of two or three miles, walking a part of the way, and riding a part. On reaching home, requesting the friends who were with him to go into the house, he cut and gathered up some wood, carried it into the house, ate his supper, and laid down after awhile. Between this time and his death, which occurred five or six weeks afterwards, he was about in the woods, cutting wood, and was at the defendant's gin, driving his ox-team; and during this period three physicians were called in, or attended him. One of these physicians, Dr. Geo. A. Parker, since deceased, whose deposition was taken at the instance of the defendant, and read on the trial, testified that he first examined the wound, and afterwards visited the deceased, and that he did not believe said wound caused the death. Another one, Dr. Burnam, who visited the deceased with Dr. Parker and at his instance, and who was examined as a witness for the State, testified that he saw the deceased once, and that he did not at the time think the wound was calculated to produce death. The third physician, Dr. Drennen, examined as a witness for the State, testified that he was called in to see the deceased on the 2d February, 1881; that he probed the wound with a silver probe, raised the depressed bone, and gave the deceased some medicine; that he sent him medicine on the 5th February, and visited him on the 6th, when he was much better; and on hearing from him on the 9th, discharged him as well, and was not called in afterwards. Dr. Drennen testified, that he did not at the time think the wound was calculated to produce death, and he gave it as his opinion that the wound was not sufficient to produce death; and it was shown that Dr. Drennen was the last physician who was called in or attended the deceased. The testimony of some of the family and friends of the deceased, who were with him, or visited him at intervals, before and until his death, tended to show that the deceased, after the infliction of the wound, and until his death, at times was, or appeared to be, in a stupor, and complained of his head, and of nothing else. The State also examined several physicians as experts, as to whether the wound was calculated to produce death; and this testimony tended to show, in part that it was, and in part that it was not, calculated to produce death."

"As to the circumstances of the difficulty, the evidence tended to show that it occurred in a saloon, between sunset and dark, about January 8th, 1881; that the deceased was seen, between twelve and one o'clock that day, near the saloon, standing on the steps of McEntepe's store, when he slapped his hands on his thighs, and said that he was the best man on the ground, and that if McDaniel, the defendant, came on the

ground, he would stick his knife, which he then had open in his hand, in his heart. The defendant came to the saloon late in the evening, the deceased being there at the time. They got to quarrelling in the saloon, about railroad land; but just how, or by whom, the quarrel was commenced, was not clearly shown, some of the evidence tending to show that it was commenced or encouraged by the defendant, and some tending to show that it was commenced by the deceased. After the quarrel commenced, the parties went into a back room, and were quarrelling in there, when the keeper of the saloon went in and ordered them out, and they then went into the saloon. As to which of the parties went into the back room first, and which returned first into the saloon, the evidence was conflicting. After the quarrel commenced, the defendant was seen to take a weight from the counter, and put it into his pocket; he had a large weight in his hand, which he laid down, and picked up a smaller one and put it in his pocket. An admission as to the testimony of an absent witness was read to the jury at the instance of the defendant, tending to show that, while the defendant was in the back room, the deceased in the saloon, having an open knife in his hand, said that, if the defendant came back into the saloon, he would put that knife into his heart; and that this was said five or ten minutes before the blow was given. At the time the blow was given, the deceased was standing with his back to the counter in the saloon, and the defendant was six or eight feet away, near the door into the back room. As to the exact position of the deceased at the time, and as to the words used, the evidence was conflicting; but that there was an open knife in the right hand of the deceased was testified to by all. The testimony, in part, tended to prove that the deceased, while leaning against the corner, and having the open knife in his right hand, holding it up, and marking on the blade with one of his fingers, said to the defendant, ' *You need this much of this steel;*' or, ' *You need, and will get this much of this steel;*' or, ' *You need this much of this steel, and I will give it to you.*' Some of the testimony tended to show that, when this was said, or (as some other testimony tended to show) when it was repeated, the defendant took his hand from his pocket, threw [the iron weight], or made the throwing motion, and the head of the deceased fell back, when the lick was heard.

"The defendant had the benefit of the testimony of one McBrear, who was present at the difficulty, and was examined as a witness for the State on the defendant's preliminary examination, but had since died. The testimony of said McBrear, as testified to by Geo. H. Parker, tended to show that the quarrel was commenced by the deceased, and was followed up

[McDaniel v. The State.]

by him; that while standing at the counter, he said to the defendant, ' *You need this much of this steel, and,*' with an oath, ' *I'll give it to you,*' and made a motion with the open knife towards the defendant, who then threw. On cross-examination of said Parker, the counsel for the State asked him, if he knew what Dr. Drennen testified to on the preliminary trial; to which question the defendant objected, and duly excepted to the overruling of his objection. Parker answered, that he did recollect; and being then asked what it was, his answer tended to show that the testimony of said Drennen on said preliminary trial was substantially the same as on this trial."

"On the foregoing testimony, in substance all that was offered on the trial, so far as material to the points presented by this bill of exceptions, the court charged the jury in writing, at the instance of the State," among other things, as follows: 2. "To make out a case of justifiable self-defense, the evidence must show that the difficulty was not provoked or encouraged by the defendants." 3. "To make out a case of justifiable self-defense, the evidence must show that the difficulty was not provoked or encouraged by the defendant; that he was at the time, or appeared to be, so menaced as to create a reasonable apprehension of danger to his life, or of grievous bodily harm, and that there was no reasonable mode of escape from such impending peril."

The defendant duly excepted to each of these charges, and then requested the following charges, which were in writing: (1.) "If the jury believe, from the evidence, that the defendant acted in self-defense, and under an impending danger of death, or of great bodily harm, from the hands of the deceased, then the defendant is not guilty of any offense." (2.) "If the jury believe, from the evidence, that improper treatment was the immediate cause of the death of the deceased, then they must find the defendant not guilty." (3.) "If the jury have, from the evidence, a reasonable doubt of the character of the instrument with which the wound received by the deceased was inflicted, then they must find the defendant not guilty." (4.) "In order for the killing of a human being to be murder, it must be *willful*—which means, on purpose to take the life of the one killed; *deliberate*—which means, on reflection; *malicious* —which means, wickedness or depravity of heart (not enmity) towards a single individual, or towards mankind in general; *and premeditated*—which means, determined on beforehand." (5.) "If the jury can not find from the evidence what caused the death of the deceased, they must find the defendant not guilty." (6.) "If the jury, after considering all the evidence, are in doubt, even the slightest doubt, as to what in fact caused the death of the deceased, they must find the defendant not

[McDaniel v. The State.]

guilty as charged in the indictment." The court refused each
of these charges, and the defendant duly reserved exceptions.
to their refusal.

GEO. II. PARKER, and HAMILL & LUSK, for appellant, cited
the following authorities: 1. As to the insufficiency of the
copy of indictment served on the defendant, Code, § 4872;
Clark's Manual, § 2363; *Driskell v. The State*, 45 Ala. 21;
*Ezzell & Walker's* case, 54 Ala. 165; *Bain v. State*, 70 Ala.
4. (2.) As to charges given and refused, to which exceptions
were reserved: *Taylor v. The State*, 48 Ala. 180; *Mitchell
v. The State*, 60 Ala. 26; *Cross v. The State*, 63 Ala. 40;
*Flanagan v. The State*, 46 Ala. 703; *Oliver v. The State*, 17
Ala. 587; *Harrison v. The State*, 24 Ala. 67; *Hill v. The
State*, 73 Ala. 366; *Walker v. The State*, 73 Ala. 171; Clark's
Manual, p. 78, § 490; Clark's Crim. Law, §§ 384, 430; 17
Iowa, 138.

T. N. McCLELLAN, Attorney-General, *contra*, cited *Hubbard
v. The State*, 72 Ala. 167; *Ezzell v. The State*, 54 Ala. 165;
*Underwood v. The State*, 72 Ala. 220; *Haley v. The State*,
63 Ala. 83.

STONE, C. J.—One of the mooted questions in the court
below was, whether the blow inflicted by the defendant caused ·
the death. On this question, the testimony—notably that of
the experts—was in conflict. There seems to have been no
dispute of the facts, that the accused struck the deceased in
the forehead with an iron weight, causing a serious wound, and
that when the exhumed skull was exhibited on the trial, it was
found seriously fractured, at or about the part where the blow
took effect. The contested inquiry was, the causal connection
between the blow and the death, which occurred some weeks
afterwards. We feel we are within the domain of common
knowledge, when we affirm that a fracture of the skull, press-
ing it upon the brain, is a dangerous wound, which may cause
death, but which does not necessarily, and in all cases, produce
that result. Prompt and skillful surgical treatment may, in
some cases, relieve and save the patient. Nor can it be affirmed
that, in every such case, death will ensue, even without treat-
ment. Still it is a dangerous wound, that may produce death.

When death does not ensue closely upon the infliction of
the blow, which it is alleged causes it, many contentions have
arisen, and continue to arise, as to the rule of causal connection
to be observed in such cases. In some of the phases of this
question, certain rules have been declared, which seem to rest
on impregnable grounds. In 2 Bish. Cr. Law, 7th ed., § 638,

it is said : " The doctrine is established, that if the blow caused the death, it is sufficient, though the individual might have recovered had he used proper care of himself, or submitted to a surgical operation, to which he refused submission, or had the surgeon treated the wound properly." This we understand to be the rule where the wound is in its nature mortal, or likely to produce death. So, we think, it results as a corollary, if the death result in part from a blow wrongfully given, which may produce death, and partly from neglect, or unskillful treatment, then the assailant is guilty of the homicide, in the degree the attendant circumstances assign to the act.—*McAllister v. The State*, 17 Ala. 434 ; *Parsons v. The State*, 21 Ala. 300. But, where the wound is not of itself mortal, and the party dies in consequence solely of the improper treatment, not at all of the wound, the result is otherwise.—*Parsons v. State, supra;* 2 Bish. Cr. Law, § 639. In 1 Whar. Cr. Law, 8th ed., §§ 157, 158, the rule is stated thus : " The true test is, whether the deceased's death followed as an ordinary and natural result from the conduct of the defendant. If so, it is no defense that the deceased, under another form of treatment, might have recovered. . . But, if the result is caused by the malpractice of the physician, the wound not being in itself mortal, and the physician not acting in concert with the defendant, then the defendant is not responsible ; for the wound, though a condition of the killing, is not its juridical cause."

The second and third charges given at the instance of the State are faulty. They make it a condition of acquittal, under the plea of self-defense, that " the evidence must show that the difficulty was not provoked or encouraged by the defendant." This was a misplacing of the burden of proof. Enough for defendant, if he showed that he was, really, or to ordinary appearance, in imminent peril of life or limb, from which he had no other reasonable means of escape. To this defense it would have been a full answer, if the testimony had shown the defendant provoked or encouraged the difficulty. The law, however, does not presume such provocation or encouragement, and does not require disproof of it, unless there be testimony tending to prove its existence. Even then, it can not be affirmed, as matter of law, that it must be disproved. The rule is, that its existence, when shown, is an answer to the plea of self-defense, but its existence is not presumed, so as to impose on the defendant the burden of its disproof.—*DeArman v. The State*, 71 Ala. 351 ; *Storey v. The State, Ib.* 329.

Of the charges requested by defendant, the first was properly refused, because it ignored all inquiry whether defendant contributed to the bringing on of the difficulty. The second was properly refused, because it demanded an acquittal, if there

[Jones v. The State.]

was unskillful treatment, the immediate cause of death, notwithstanding the wound may have been in its nature mortal, and notwithstanding it may have contributed to the death. *Bowles v. The State*, 58 Ala. 335. The third charge was abstract and misleading, having no testimony to rest on. The fourth charge postulates murder in the first degree, but not murder in the second degree. It was immaterial, however, as the defendant was convicted of manslaughter only, and can never again be tried for murder under this charge. The fifth charge is misleading, in view of the testimony in this cause; and the sixth charge does not assert a correct principle of law.

The record shows that the witness Parker was allowed, against the objection of defendant, to prove that Dr. Drennen's testimony before the committing magistrate, was substantially the same as that given on the final trial. If the record showed that, in a proper way, attempt had been made to impeach Dr. Drennen, by showing his testimony was materially variant from that given on the former trial, then Parker's testimony would have been admissible. It is not shown in this record that any such attempt had been made. It is not permissible to make proof sustaining the credibility of one's own witness, until attempt has been made to impeach it, in some of the forms known to the law.

There is nothing in the objection to the indictment, nor to the copy served on defendant.

Reversed and remanded. Let the defendant remain in custody, until discharged by due course of law.

## Indictment for Murder.

