[Crim. No. 4782. In Bank. Dec. 19, 1947.]

THE PEOPLE, Respondent, v. HENRY ALEXANDER McGEE, Appellant.

232

A. Brigham Rose for Appellant.

Robert W. Kenny, Fred N. Howser, Attorneys General, Henry A. Dietz and Frank Richards, Deputy Attorneys General, for Respondent.

SCHAUER, J.—Defendant was charged by information with the murder of Arthur Rypdahl. A jury found him guilty of manslaughter. He appeals from the ensuing judgment of conviction and from an order denying his motion for new trial, and purports to appeal from an order denying his motion in arrest of judgment. From our review of the entire record it does not appear that the asserted errors (hereinafter more particularly discussed) of which defendant complains operated to his prejudice or resulted in a miscarriage of justice. The judgment and order denying a new trial must therefore be affirmed in accord with the mandate of section 4½ of article VI of the California Constitution. ▇ The order denying defendant's motion in arrest of judgment is not an ''order made after judgment'' and therefore is not appealable. (Pen. Code, §§ 1237, 1185; the cases are collected in 8 Cal.Jur. 493, § 508, n. 13.)

▇ Defendant was bound over by the committing magistrate to answer to a charge of manslaughter only. He contends that the evidence before the magistrate failed to show that the crime of murder had been committed; that therefore the district attorney was without authority to file an information accusing defendant of murder and the trial court erred in denying defendant's various motions to set aside the

information and to compel a trial on the charge of manslaughter only. The district attorney is empowered by section 809 of the Penal Code to "charge the offense . . . named in the order of commitment, or any offense . . . shown by the evidence taken before the magistrate to have been committed." Under this section the district attorney can charge murder, if the evidence at the preliminary hearing shows such offense, although defendant has been held to answer for the offense of manslaughter. (*People* v. *Bird* (1931), 212 Cal. 632 [300 P. 23].)

 The evidence before the committing magistrate is as follows: On the evening of July 16, 1945, defendant and one Linck went to the club rooms of a fraternal organization in San Pedro. They had two drinks at the bar, then entered the card room. Linck joined in a card game (with persons with whom defendant apparently had no previous acquaintance) for 15 or 20 minutes. Defendant took Linck's place at the card table when Linck went to the bar, where he remained for about 15 minutes. Defendant then came from the card room and he and Linck went out of the club. They immediately returned to the card room because Linck believed he had left $40 on the card table. Linck asked, "Gentlemen, do you know what became of the money I left on the table?" One of the players pointed to defendant. Linck asked defendant, "Hank, did you take it?" or "Did you play?" Linck "understood him [defendant] to say yes" and Linck and defendant left the card room. As they walked through the bar, which was dimly lighted, toward the street exit deceased came from the card room. Deceased came toward defendant and when he was "about 6 or 8 feet away" he ("the man coming towards McGee") "pulled his hand around from back of him." At this point (whether just after or just before the described hand movement by Rypdahl is not clear), just as Linck had started to open the door, defendant shot deceased in the abdomen. As a result of hemorrhage from the bullet wound deceased died the next day.

The above-summarized evidence clearly met the requirement that it show "that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof." (Pen. Code, § 872; *People* v. *Nagle* (1946), 25 Cal.2d 216, 222 [153 P.2d 344].) While the committing magistrate was amply justified in concluding that such evidence showed the public offense to be manslaughter rather

than murder he would also have been warranted, on a different view of the same evidence, in concluding that the offense was murder of the second degree. "When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree. [Citations.]" (*People* v. *Howard* (1930), 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Thomas* (1945), 25 Cal.2d 880, 895 [156 P.2d 7].) The district attorney, as previously shown, was not bound by the view of the committing magistrate; he was free to construe the evidence or draw inferences adversely to defendant and to file an information charging the highest offense of which any reasonable construction of the evidence admitted.

Defendant complains that the trial court erred to his prejudice in instructing the jury. The asserted errors in large part concern the types of homicide. In order that their effect may appear, the evidence at the trial favorable to defendant as to this subject is summarized.

Before defendant encountered deceased at the club on the evening of July 16, deceased had drunk 10 or 12 highballs of scotch and soda. When, as indicated in the above summary of the testimony at the preliminary hearing, defendant's companion Linck left the card table and defendant took his place, deceased was one of the players. Deceased said to defendant, "I don't like your looks. . . . Who asked you to sit down at this poker game?" Defendant replied, "Nobody asked me to sit down. It has always been customary when there is a vacant seat at the game to sit down and play." Defendant played one hand of poker. He apparently was not familiar with the game and he and deceased argued about this. Deceased then told the dealer, "don't deal him [defendant] in this time. . . . I don't think he is a member of this lodge." Defendant upon request produced his "credentials," including his lodge membership card. Deceased examined the card and showed it to the other members, who said, "Well, it looks like everything is in order." Deceased threw defendant's "credentials" at him. Defendant continued to sit at the table but deceased, whose deal it was, dealt defendant no cards. Defendant said, "I was dealt out." Deceased replied, "We don't care whether you are a member or not, you are not going to play in this game." On the next deal defendant was again dealt out. Deceased

called defendant a "no good bastard." After he was dealt out the third time defendant said, "well, the hell with it—if you gentlemen don't want me in the game, I will leave." Defendant started from the room. Deceased called defendant back, shoved him against a pool table, and told him "to get out of the club and stay out" or he "would be carried out feet first." Defendant rushed from the card room. He and Linck left the club momentarily, then returned to the card room and Linck inquired whether he had left $40 on the table. When Linck asked the whereabouts of the money deceased pointed to defendant. Linck said to defendant, "Forget it," "Let's go," but defendant looked about under the table and chairs. Deceased said, "Well, you are back again, huh?" Defendant then started to leave. Deceased said, "Just a minute, I want to talk to you again." Defendant was "so scared" that he hurried toward the outer door, which Linck was opening. Deceased followed defendant and said that "You are not going to get out of here that easy. . . . I still mean what I said—you are going out of here feet first," that defendant had tried to make deceased "look like a thief," and that "I ought to cut your God damned throat." When defendant was about 5 feet from the outer door, deceased "was running after me, and it seemed like he was right at my back. I had my hand in my right coat pocket [in which was a pistol] and he was yelling at me, and it seemed he was right behind me, and I was so scared I turned around and he looked like a great big gorilla running down on top of me, and I was so scared I fired through my pocket." The gun was a .41 caliber over-and-under Derringer and was carried by defendant because of certain threats which had been made by a person or persons other than deceased. The shooting was in the presence of Linck and the bartender, and at least six other members of the lodge were in the immediately adjoining card room. Defendant "didn't intend to shoot Mr. Rypdahl. I intended to try and scare him—stop him—because he was right on me." Defendant left the club immediately, thereafter left Los Angeles County, and several months later voluntarily surrendered to the authorities.

The first asserted prejudicial error in instructions is that the charge gives "undue prominence" to the crime of murder. The instructions give no more "prominence" to the definition of that crime than to the definition of other types of homicide which might be found under the evidence. It

was not only proper but necessary that the jury be instructed as to the crime of murder for, had they taken another view of the evidence, they could have found that the homicide was murder of the second degree. The Penal Code (§ 189) defines such offense as "all other kinds of murders" than those which are of the first degree. It is customary and, because of the wording of the statute, not improper in a homicide case where the crime could be found to be murder to tell the jury what types of murder are of the first degree in order that they can more readily comprehend what constitute the "other kinds of murders" which are of the second degree. (Murder of the second degree has, however, been defined independently of that of the first degree. *People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 903; *People* v. *Bender* (1945), 27 Cal.2d 164, 181-182 [163 P.2d 8].) Hence, it was not error, under the circumstances of this case, to instruct the jury that murders committed in certain manners or in the perpetration of certain crimes are of the first degree, even though there was no evidence that the homicide was so committed. Only forms of verdicts of guilty of second degree murder, manslaughter, and of not guilty, were submitted to the jury and there is no indication of any attempt to mislead the jury into believing that the defendant might have been found guilty of murder of the first degree. The charge concerning the degrees of murder is not a model but defendant points out and we have found no respect in which errors therein could have prejudiced defendant in the circumstances of this case.

■ Among the instructions to which defendant objects, because it is entirely irrelevant to any issue in the case, is the following stock instruction: "If the accused was engaged in the performance of an unlawful act, and if the deceased attempted in a lawful manner to prevent the performance of such unlawful act, and if, while so endeavoring to prevent the same, the defendant in anger and solely for the purpose of revenge, or to enable him to carry out his unlawful design, so interfered with by said deceased, attacked the latter with a deadly weapon, intending to kill said deceased, and did, under such circumstances, carry such intention into execution, the fact that defendant was in a passion would not mitigate or excuse such homicide, but the crime committed would in such case be murder in the first degree. It is not less murder because the act is done suddenly after the intent to commit the homicide is formed. It is sufficient that the

malicious intention precedes and accompanies the act of homicide.'' As stated in *People* v. *Valentine* (1946), 28 Cal.2d 121, 134-135 [169 P.2d 1], ''This instruction is manifestly erroneous. According to its first sentence, if the accused in a sudden, violent quarrel growing out of the protest of deceased against the commission by defendant of any unlawful act, however trivial, killed deceased with a deadly weapon, the homicide would be murder in the first degree. That is not the law. The statement as made transgresses the rules both as to voluntary manslaughter and as to the difference between first and second degree murder. The second and third sentences of this instruction are likewise manifestly erroneous if, as they apparently do, they too refer to first degree murder. They destroy the statutory difference in the degrees of murder and authorize conviction of first degree murder upon proof of facts amounting only to second degree murder. [Citations.]'' Although this instruction should never be given, no manner in which it could have prejudiced this defendant, upon the record and in the light of the verdict, appears.

Another instruction which was condemned in *People* v. *Valentine, supra* (pp. 137-144), was given. The instruction reads as follows: ''It is a settled rule in law that neither provocation by words only, however opprobrious, nor contemptuous or insulting actions, or gestures without an assault upon the person, nor any trespass against lands or goods, are of themselves sufficient to reduce the offense of intentional homicide with a deadly weapon from murder to manslaughter.'' In fairness to the trial court it should be noted that the Valentine case was decided after the trial of this case and that prior to the Valentine decision there existed two irreconcilably conflicting lines of authority as to the correctness of the rule embodied in the last-quoted instruction. Although such rule is not the law of this state, stating it to the jury did not, as appears from their verdict, prejudice defendant.

The instructions as to justifiable homicide, although they contain no actual misstatement of law, are not clear cut, impartial statements of law but are phrased from the point of view of the prosecution. They include the instructions quoted and criticized for this reason in *People* v. *Hatchett* (1944), 63 Cal.App.2d 144, 157-159, 162, 165 [146 P.2d 469]. Certain of these instructions were similarly criticized in *People* v.

*Estrada* (1923), 60 Cal.App. 477, 483 [213 P. 67]. The District Court of Appeal appropriately remarked, in the Hatchett case (p. 159 of 63 Cal.App.2d), that "It would seem that the criticism of the instructions in the Estrada case, which came up from Los Angeles County, called for their revision and the use of instructions on self-defense which stated the law with complete impartiality." Nevertheless, district attorneys and trial courts have recurrently used these instructions. Persistence in this practice must necessarily result in reversal of the judgment if prejudice is shown. Instead of reiterating principles slanted from the prosecution point of view, the trial court should have instructed the jury as to the principle of apparent necessity from the point of view of a reasonable person in the position of defendant as shown by any tenable view of the evidence, and this despite the fact that defendant's proposed instructions on the subject were in part so confusingly worded as to be properly refused. However, we cannot agree with defendant that the instructions as given are, on the facts of this case, ground for reversal. From the evidence it does not appear reasonable to conclude that the jury, had they been otherwise instructed, would have found that the circumstances were "sufficient to excite the fears [of death or great bodily injury] of a reasonable person" and that defendant shot deceased "under the influence of such fears alone." (Pen. Code, § 198, which was read as an instruction.)

 Defendant complains that the instructions included the code definition of involuntary manslaughter; i.e., a killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192.) If defendant, as he testified, discharged the pistol with intent only to frighten, and not to shoot deceased, and such act was not done in the exercise of defendant's right of self-defense, he could be found guilty of involuntary manslaughter. (See 23 A.L.R. 1554; 55 A.L.R. 921.) The instruction appropriately covers evidence which the jury could—and may—have found true.

 It is also contended that testimony of a conversation between a police officer and defendant was improperly admitted and that the instruction given as to accusatory statements is erroneous. The conversation was in material part as follows: The officer told defendant that he "was accused of the murder of Arthur Rypdahl" and "asked him if he cared

to affirm or deny that accusation. . . . He answered, 'I am not going to answer that question. My attorney told me not to unless he was present.' '' To all subsequent statements and questions of the officer defendant said, ''I have nothing to say'' or ''same answer'' or, perhaps, after repeatedly indicating his position, remained silent as to some questions. Such subsequent statements and questions were as to matters concerning which defendant testified at the trial; e.g., that he did go to the club with Linck on the evening of July 16, 1945; that he then had the pistol and there shot deceased; that he left San Pedro and subsequently surrendered to the authorities.

The instruction complained of is as follows: ''You are instructed that when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating an admission of guilt. The only purpose for which an accusatory statement is received in evidence is to show acquiescence or admission on the part of a defendant in the face of an accusatory charge, and unless you are convinced beyond a reasonable doubt that the defendant did stand mute when the accusatory statements were made such statements should be entirely disregarded by you.''

The one accusatory statement to the truth of which defendant did not testify, is the statement as to the accusation of murder quoted above. Defendant certainly did not ''stand mute'' when such statement was made, but explained why he did not ''affirm or deny that accusation.'' Nor can it fairly be said that in legal effect, to constitute a ground for the admission of the accusatory statements, he stood mute as to any of them, for it was only after clearly indicating a proper reason for not replying that he can be found to have remained silent as to any question. Manifestly, in the light of the fact that defendant did not merely ''stand mute'' and did state in effect that his attorney had advised him not to discuss the matter unless the attorney was present, it was error to admit the evidence in question and to give any instruction on the subject of accusatory statements. (*People* v. *Simmons* (1946), 28 Cal. 2d 699, 712-713, 718-721 [172 P.2d 18]; see, also, *People* v. *Flores* (1936), 15 Cal.App.2d 385, 405-406 [59 P.2d 517].) But it does not appear, in the light of the whole record, with particular reference to his own testimony and to the verdict,

that defendant was prejudiced either by the admission of the evidence or the giving of the incorrect instruction.

 Defendant contends that the trial court erred to his prejudice by excluding evidence which, defendant says, would have tended to show that the proximate cause of Rypdahl's death was not the bullet wound but the manner in which the wound was treated. In 8 American Law Reports at page 516, the general rule as to criminal responsibility of one who wounds another, for the death of the victim, is stated as follows: ''When a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide.'' Following this general rule, it has been held that where the wound inflicted by the accused operates as a cause of death, the fact that the malpractice of attending surgeons may have had some causative influence will not relieve the accused from full responsibility for the ultimate result of his act. (*People* v. *Kane* (1915), 213 N.Y. 260 [107 N.E. 655, Ann.Cas. 1916 C 685, L.R.A. 1915 F 607].) On the other hand, in qualification of the rule, it is said that (8 A.L.R. 520), ''Where a person inflicts on another a wound not in itself calculated to produce death, and the injured person dies solely as a result of the improper treatment of the wound by an attending physician or surgeon, the fact that the death was caused by medical mistreatment is a good defense to a charge of homicide,'' citing *Parsons* v. *State* (1852), 21 Ala. 300; *McDaniel* v. *State* (1884), 76 Ala. 1; *Bush* v. *Com.* (1880), 78 Ky. 268; *Tibbs* v. *Com.* (1910), 138 Ky. 558 [128 S.W. 871, 28 L.R.A.N.S. 665]; *State* v. *Scott* (1857), 12 La.Ann. 274; *People* v. *Kane* (1915), *supra*, 213 N.Y. 260 [107 N.E. 655, Ann. Cas. 1916 C 685, L.R.A. 1915 F 607]. On this subject it has been said to be ''the proper, and probably generally accepted, view . . . that mere negligence [in the treating of a wound] is no defense even though it is the sole cause of death because it is a foreseeable intervening cause. But death caused by grossly improper treatment is not the proximate consequence of the defendant's injury unless the injury is an actual contributing factor at the time of death, because such treatment is an unforeseeable intervening cause. [Citing *People* v. *Whithurst* (1858), 2 Labatt 178; *People* v. *Dallen* (1913), 21 Cal.App. 770, 778 [132 P. 1064].]'' (Focht, *Proximate Cause in the Law of Homicide,* 12 So.Cal.L.Rev. 19, 34; see, also *People* v. *Lewis* (1889), 124 Cal. 551, 558-559

[57 P. 470].) The evidence as to the nature of the wound inflicted by defendant and the treatment thereof is as follows:

Deceased was shot at about 10:30 p. m. on July 16, 1945. According to hospital records in evidence (Code Civ. Proc., § 1953e) deceased was admitted to the hospital at 11 p. m. on the 16th; X-rays showed that the bullet was at the point from which it was subsequently removed by the autopsy surgeon; on July 17 at 9:05 a. m., some 10 hours after admission to the hospital, deceased was taken to surgery; his condition was then "very poor. . . . Surgical Risk, poor"; one hour later, at 10:05 a. m., an operation was commenced; it ended at noon. It further appears from the hospital records that the abdomen was entered through a high midline incision (hereafter called the anterior incision); there were blood and blood clots in the abdominal cavity; *liver, stomach, pancreas, spleen, and intestines were "normal," revealing "no penetration of a foreign body"* (italics added); the abdomen was packed with gauze and closed; a small incision for a drainage tube was made; and deceased's post-operative condition was recorded as "critical." He died about 7 p. m. on July 17.

An autopsy was performed on July 19 at 10:45 a. m., after the body had been embalmed. The autopsy surgeon found the anterior incision which opened the abdomen and the small incision where the drainage tube had been inserted. He testified that the bullet had grazed the liver, *gone through the pancreas and spleen,* and come to rest behind the upper pole of the left kidney; that there was "profuse hemorrhage throughout the course of the wound"; and that *such hemorrhage was the immediate cause of death.* In the opinion of the autopsy surgeon the gunshot wound was such that *"If it was not controlled [by hemostasia, gauze packing, etc.] it would be only a matter of an hour, or an hour and a half, before there would be a profuse hemorrhage sufficient to cause death"* and the anterior incision permitting such control was made "Within at least two hours after the wound." (Italics added.) (It will be remembered that the hospital records show that such incision was not made until some 12 hours after deceased was shot and 11 hours after his admission to the hospital.) The autopsy surgeon also found a posterior incision starting two inches to the left of the spine and following the course of the lower rib for four inches. The purpose and time of making this incision and the person by whom it was made, do not appear from the record.

■ Defendant emphasizes the conflict between the evidence of the hospital records (according to which the liver, pancreas, etc., were not penetrated by any foreign body) and that of the autopsy surgeon (according to whom the bullet had grazed the liver, penetrated the pancreas, etc., and who found the posterior incision not mentioned in the hospital records). Defendant asserts that ''any competent evidence that would have helped to explain this mysterious discrepancy . . . should have gone before the jury for proper consideration.'' But defendant did not offer at the trial, nor does he suggest on appeal that he could have produced, any competent evidence as to the course of the bullet or the making of the posterior incision. Therefore, he cannot complain that the ''mysterious discrepancy'' was not explained.

■ Defendant produced and qualified Dr. Jesse L. Bloch as a medical expert. Dr. Bloch testified, ''I do not know anything about the. case'' of Rypdahl's injury, treatment and death. Therefore, he could have testified only to his expert opinion in answer to hypothetical questions. Defendant asked such questions, framed on a theory supported by evidence of the autopsy surgeon and the hospital records, for the purpose of showing that Rypdahl would not have died if the surgeon who attended him had not, grossly contrary to proper surgical practice, failed for more than 10 hours after Rypdahl's admission to the hospital to take any action to control the hemorrhage from the bullet wound. Defendant made no formal offer of proof, but such offer was not necessary because the questions themselves, together with colloquies with the trial judge, in the light of previously introduced testimony, clearly disclose their purpose, and since they were directed to defendant's own witness they indicate that the answers were expected to be favorable to defendant. (See *People* v. *Duane* (1942), 21 Cal.2d 71, 81 [130 P.2d 123] ; *People* v. *Pereles* (1932), 125 Cal.App.Supp. 787, 792 [12 P.2d 1093].) The trial court upon erroneous grounds sustained objections to such questions. The objections and the rulings thereon disclose that the court and the deputy district attorney labored under the misconceptions that the question of what constitutes proper, improper and grossly improper surgical procedure in a given situation is not a subject for expert testimony, and that the hypothetical questions were insufficient (even though they set forth an assumed state of facts supported by evidence applicable to

Rypdahl) because no "foundation" was laid with respect to Rypdahl.

The refusal to permit Dr. Bloch to testify, however, did not prejudice defendant because the testimony which defendant apparently expected from him would not, as a matter of law, have been sufficient to show a supervening cause of death which would relieve defendant from criminal responsibility for the death of Rypdahl. Viewed most favorably to defendant the evidence sought to be elicited from Dr. Bloch, with the evidence of the autopsy surgeon and the hospital records, together also with the testimony of defendant, would have disclosed the following situation: Defendant, without aiming and without intending to shoot Rypdahl, unlawfully, or "without due caution and circumspection," discharged a pistol which was pointed toward Rypdahl. The immediate result of this unlawful or incautious act was the wounding of Rypdahl. The direct result of the wound was "profuse hemorrhage" which would be "sufficient to cause death" if it was not promptly controlled. Having thus set in motion the events which culminated in Rypdahl's death, defendant departed. The surgeon in whose care Rypdahl was promptly placed neglected for more than 10 hours, grossly contrary to good surgical practice, to control the hemorrhage. We assume further that Rypdahl's life might have been saved by prompt and proper surgical treatment. But defendant cannot complain because no force intervened to save him from the natural consequence of his criminal act. The factual situation is in legal effect the same, whether the victim of a wound bleeds to death because surgical attention is not available or because, although available, it is delayed by reason of the surgeon's gross neglect or incompetence. The delay in treatment is not in fact an intervening force; it cannot in law amount to a supervening cause.

For the reasons above stated the judgment and the order denying defendant's motion for new trial are affirmed. The attempted appeal from the order denying his motion in arrest of judgment is dismissed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority opinion in this case shows a record replete with error. One instruction is held to be "manifestly erro-

neous'' in each of the three sentences of which it is composed, and irrelevant to any issue in the case. Another instruction is held to incorrectly state the law as clarified in *People* v. *Valentine*, 28 Cal.2d 121, 137-144 [169 P.2d 1]. With respect to other instructions (and their number is not stated), bearing on the issue of justifiable homicide, it is said that "although they [the instructions] contain no actual misstatement of law, [they] are not clear cut, impartial statements of law but are phrased from the point of view of the prosecution. They include the instructions quoted and criticized for this reason in *People* v. *Hatchett* (1944), 63 Cal. App.2d 144, 157-159, 162, 165 [146 P.2d 469]. Certain of these instructions were similarly criticized in *People* v. *Estrada* (1923), 60 Cal.App. 477, 483 [213 P. 67]. . . . Instead of reiterating principles slanted from the prosecution point of view, the trial court should have instructed the jury as to the principle of apparent necessity from the point of view of a reasonable person in the position of defendant as shown by any tenable view of the evidence, and this despite the fact that defendant's proposed instructions on the subject were in part so confusingly worded as to be properly refused.''

Testimony of a conversation between a police officer and defendant is held to have been improperly admitted, and in connection with it an instruction on the subject of accusatory statements is held to have been erroneously given. Further errors are held to have been committed by the trial court's rulings excluding evidence which defendant contends would have tended to show that the proximate cause of the victim's death was not the bullet wound but the negligent manner in which the wound was treated. The majority opinion states: "The objections and the rulings thereon disclose that the court and the deputy district attorney labored under the misconceptions that the question of what constitutes proper, improper, and grossly improper surgical procedure in a given situation is not a subject for expert testimony, and that the hypothetical questions were insufficient (even though they set forth an assumed state of facts supported by evidence applicable to Rypdahl [the victim]) because no 'foundation' was laid with respect to Rypdahl [the victim].''

In the face of this plethora of error, the majority opinion concludes that no prejudice was suffered by defendant and that no reversible error was committed. This conclusion is

reached by the method of discussing separately with respect to each error the matter of prejudice resulting from it. The question whether the accumulation of error is so heavy as to itself constitute possible prejudice is not mentioned. The subject of the cumulative effect of numerous errors, each of which separately committed might not show prejudice, should be considered. Where mistakes on the part of the trial court abound and touch not only the charge to the jury but also rulings on evidence, it cannot be assumed that defendant has had a fair trial and that no miscarriage of justice has resulted. (See *People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607]; *Hirshfeld* v. *Dana,* 193 Cal. 142, 150 [223 P. 451]; *Adkins* v. *Brett,* 184 Cal. 252, 261 [193 P. 251]; *People* v. *Newcomer,* 118 Cal. 263, 267 [50 P. 405]; *People* v. *Hatchett,* 63 Cal.App.2d 144, 152 [146 P.2d 469]; *People* v. *Flores,* 15 Cal.App.2d 385, 406 [59 P.2d 517]; *Valentine* v. *Provident Mut. L. Ins. Co.,* 12 Cal.App.2d 616, 621 [55 P.2d 1243].)

As said in *People* v. *Mahoney, supra,* at page 627: "The fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice. In this case the defendant did not have the fair trial guaranteed to him by the law and the constitution." Again, as declared in *People* v. *Flores, supra,* at page 406: "Prejudice is a matter of degree. An incident in the light of one record might not necessarily be prejudicial and reversible error, but a similar incident in the light of another record might be highly prejudicial. The record presented herein is such character that relatively slight error could have easily resulted in a miscarriage of justice. . . ." Lastly, are the pertinent remarks from *People* v. *Hatchett, supra,* at page 152: "We have found it necessary to discuss a good many of the instructions given and some of those refused, and our conclusion is that the errors were such as to require a reversal. It is the cumulative effect of numerous errors which forces this conclusion, and we reiterate that we are considering the probable effect of such errors upon the jury's determination of guilt in a case where guilt was not firmly established. We consider it not improbable that a conviction would not have occurred but for the errors. . . . We find appropriate to our discussion the statement of the Supreme Court in *People* v. *Newcomer* (1897), 118 Cal. 263, at 267 [50 P. 405]: 'Under these circumstances, if the appellant was justified in killing the deceased, as he might have been, he was

in the embarrassing position of one who justly kills another when there is no other witness to the homicide, when he has to admit the homicide and depend greatly upon his own testimony to justify it. In such a case it is evident that a jury will have difficulty in determining the real facts; and in such a case it is apparent that the instructions of the court are very important—particularly when, as in the case at bar, the court instructs at great length. *Under such circumstances, any instruction tending to lead the jury from the real issues in question is material, and if erroneous is reversible error.*" [Emphasis added.]

Added to the confusing situation already outlined is the fact disclosed by the majority opinion that in the charge to the jury great prominence (although perhaps, as held, not "undue" prominence) was given to the crime of murder. In view of all these circumstances, I cannot see how a reviewing court can be justified in concluding that the jury may not have been misled or that defendant did not suffer prejudice from the weight of the cumulative errors which were committed by the trial court. In my opinion, a reversal of the judgment is required.

Appellant's petition for a rehearing was denied January 15, 1948. Carter, J., voted for a rehearing.