[Crim. No. 5128. Fourth Dist., Div. One. Jan. 17, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
MELVIN CLARK, Defendant and Appellant.

**COUNSEL**

James H. Griffin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, A. Wells Petersen and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WHELAN, Acting P. J.**—Defendant Melvin Clark has appealed from a judgment committing him to prison for burglary of which he had been found guilty by a jury which found him guilty also of forcible rape, the crime for which the burglarious entry was made. Execution of the sentence on the rape charge was suspended.

The crimes of which defendant was found guilty were committed on September 25, 1971. His connection with the crimes was established by evidence that palm prints found on a window in the apartment of the victim were those of defendant.

That identity was discovered after defendant's prints were taken following his arrest on October 3.

Defendant's chief contention is that his arrest on October 3 was unlawful and the taking of his fingerprints during his detention was therefore an unreasonable search under the doctrine of *Davis* v. *Mississippi,* 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394].

He was arrested near Cedar Street between Eighth and Ninth Avenues in downtown San Diego.

In the block bounded by Cedar Street on the south, Date Street on the north, Eighth Avenue on the west and Ninth Avenue on the east, is the one-story Belmar Hotel at the southeast corner of the block; at the southwest corner of the block is another apartment building; between the Belmar and the other apartment building are two garage buildings forming an "L" with the long side running north and south, and the short side extending westerly from the north end of the longer side; the two garage buildings are separated and there are spaces between the shorter building and the apartment house to the west and between the longer garage building and the Belmar. A fence extends from the northeast corner of the more northerly and shorter garage building to the northwest corner of the Belmar building.

The block is the 1600-block of Eighth and Ninth Avenues and the 800-block of Cedar and Date Streets.

The north end of the block is occupied by the AAA building facing Date Street, behind which to the south and on either side of which is open parking space. There are two trees in the parking area near Eighth Avenue about midway of the block on that side and about due north of the northwest corner of the apartment building at the southwest corner of the block.

In the block across Eighth Avenue to the west are an apartment building at the southeast corner, an apartment building at the southwest corner, and on the northwest corner of the block a mortuary. A fence extends from the southeast corner of the mortuary to the northwest corner of the apartment building on the southeast corner of the block, which is the 700-block of Cedar Street.

At about 4 a.m. of October 3, 1971, San Diego Police Officer Clyde Bowman was seated in his car in the AAA parking lot. He was on a stake-out for a person suspected of being the perpetrator of about a dozen burglaries and rapes that had been committed in that area, which is in the downtown section of San Diego near El Cortez Hotel.

As to all the rapes the offender was described as a male Negro; the descriptions as to height and weight varied from 5 feet 9 to 6 feet 2 and from 150 to 180 pounds.

From his position in the parking lot east of Eighth Avenue, Bowman saw, across Eighth Avenue to the west, a human figure appear near the northwest corner of the apartment building at the east end of the fence running from that apartment building to the mortuary in the block west of Eighth; the figure appeared to be standing and looking easterly toward Bowman and to the north and to the south of Bowman; then the figure moved easterly to the northeast corner of the apartment building but not advancing beyond its easterly line; there the person whom Bowman now saw to be a young black man, tall and slender, crouched down and, with his head projecting beyond the east wall of the apartment, looked along Eighth Avenue to the right toward Cedar; after 20 to 30 seconds of such peering, the man backed up slightly and sat momentarily on his haunches, then moved forward again still crouching, again looked southerly along Eighth, then ran suddenly across Eighth to the northwest corner of the apartment building on the east side of the street; the two trees north of the apartment building interfered to some extent with Bowman's vision but some light from the street lights and from the AAA building shone upon the face of the man, who was looking northerly in Bowman's direction;

after about 10 seconds in that position the man moved to the northeast corner of the apartment building, put a hand on the corner of the building, leaned forward beyond the building and looked southerly in the space between the apartment building and the nearer garage building. Bowman saw then that the man had a beard and seemed to be dressed all in black. A sudden loud noise as from the backfiring of a car was followed immediately by the man's pulling back from the corner of the apartment building; after a momentary pause he went again to the corner, put his hand on the corner of the building and leaned forward looking south, then east toward Ninth Avenue, and then disappeared into the area of the garages.

Bowman then radioed for assistance and alighted from his car; almost immediately Officer Edward C. Newberry came into the area.

During that night Newberry had been engaged in similar duty and had taken a position on top of the arcade of a hotel on Beech Street between Eighth and Ninth Avenues.

At 4:25 a.m., Newberry received a call from Bowman that the latter had under observation a black man who was engaged in furtive and suspicious activity. Newberry went down to the street, entered his car and drove north on Eighth Avenue to the block between Cedar and Date, where he parked about midway between those streets on the east side of Eighth Avenue opposite the apartment building that fronted on Cedar Street.

Newberry, having parked his car, alighted and walked to the northwest corner of the apartment building which was south of the AAA parking area, in which he saw Bowman on foot, who indicated by motions the direction in which the man had gone. Newberry followed that route to the northeast corner of the apartment building, where a new indication from Bowman sent him around the corner and to the southwest corner of the more southerly and easterly garage building; he peered around the corner to the east, saw no one, so proceeded to the southeast corner of the garage, from which he saw a man, who later was identified as the defendant, standing on tiptoe with his hands on a window ledge about 6 feet above the ground, peering for some four seconds into a lighted window. The window was on the south or Cedar Street side of the Belmar and was the only lighted window in the Belmar. The building was set back from the street with a space for car parking between building and street sidewalk, in which two cars were parked west of the lighted window.

Newberry drew back into the shadow of the garage. When he looked

eastward again defendant had disappeared. Newberry then advanced and looked to the east and the north. Within one or two seconds he saw defendant running hurriedly toward Cedar Street from the area on the west side of the Belmar where there was an entrance into the building. Newberry, who was nearer Cedar, stepped forward into defendant's path and halted him.

The address given to Newberry by defendant as his place of residence was not that of the Belmar.

Newberry asked defendant from what direction he had come. By motion, defendant indicated he had come up Eighth Avenue from the south, which was contrary to the information Newberry had received from Bowman.

Newberry then placed defendant under arrest for burglary.

Bowman, while on foot and, it may be inferred, after he had indicated to Newberry the direction of the man's movements, went into the area north of the fence extending from the more northerly garage building to the Belmar building and through the fence saw a figure between the more southerly garage building and the Belmar suddenly turn, with a swirling as of a coat, and run toward Cedar Street. Bowman then went westerly to the space between the apartment building at the southwest corner of the block and the garage buildings. One or two minutes later, and after defendant had been detained by Newberry, Bowman saw defendant on the Cedar Street sidewalk. Defendant had a beard and wore a black coat.

Defendant's fingerprints were taken at the jail and subsequently were found to match those left at the scene of the burglary on September 25, 1971, of which he was convicted.

Defendant cites *Agar* v. *Superior Court,* 21 Cal.App.3d 24, 28-29 [98 Cal.Rptr. 148], in which it was said: "[*U*]*nless* it is first established that the police officer *believed* that [a given crime] had been committed by the petitioner, the issue of probable cause does not arise, for it would be a logical absurdity for the courts to be asked to determine the reasonableness of an officer's belief that that particular crime had been committed unless it were first established that the officer did entertain such a belief."

In *People* v. *Miller,* 7 Cal.3d 219 [101 Cal.Rptr. 860, 496 P.2d 1228], *Agar* v. *Superior Court, supra,* 21 Cal.App.3d 24, was cited with approval concerning the arresting officer's subjective intent as one of the criteria in determining whether there is probable cause: "Probable cause to arrest

without a warrant represents an *objective* legal standard by which to measure the reasonableness and sufficiency of the officer's *subjective* belief that the defendant has committed an offense." (*People* v. *Miller*, 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228].)

Without declaring that the factual differences between certain of the cases cited and the case at bench make those cases inapplicable, we note the existence of such differences.

In *People* v. *Superior Court (Simon)* 7 Cal.3d 186 [101 Cal.Rptr. 837, 496 P.2d 1205], *People* v. *Miller, supra*, 7 Cal.3d 219. and *Agar* v. *Superior Court, supra*, 21 Cal.App.3d 24, the crime for which the defendant was being prosecuted was one based upon the discovery of contraband in his possession as the result of a search the legality of which depended upon there having been probable cause to arrest for another offense; and there was a question also whether the offenses for which the respective defendants were placed under arrest were of a class that permitted a search as an incident to the arrest.

In *Agar* v. *Superior Court, supra*, 21 Cal.App.3d 24, the defendant was placed under arrest as the operator of an automobile for a Vehicle Code violation, which did not permit the search that produced the evidence of the crime for which he was tried. The conduct that subsequently was adduced as furnishing probable cause for arrest was unrelated to the manner of driving of the vehicle, but was Agar's presence in a vehicle from which contraband had been thrown.

Such was not the situation in the instant case. Here there had been a series of serious felonies believed to have been committed by the same person, all of which was information in the possession of the arresting officers.

In *Agar* v. *Superior Court, supra*, 21 Cal.App.3d 24, the court made it clear that it is not the precise characterization by an arresting officer of the crime for which an arrest is made that is involved in a determination whether there was probable cause for the arrest, but whether the conduct for which the person was arrested had a direct relationship with the crime for which he was prosecuted.[1]

In its procedural aspects, too, the present case differs from most of the

---

[1]"In each case cited by the People and in each of the cases which our own research has disclosed, the reason given by the officer for the arrest-and-booking is intimately related to the subsequent charge for which the accused was prosecuted." (*Agar* v. *Superior Court*, 21 Cal.App.3d 24, 31.)

cases cited by defendant. In the cited cases, other than *Agar* v. *Superior Court, supra,* 21 Cal.App.3d 24, the theories advanced on appeal were first presented there and had not been presented to the trial court, prompting the court to say, in *People* v. *Miller, supra,* 7 Cal.3d 219, 227: "[T]he People cannot introduce on appeal a new theory to justify the search, in view of the defendant's lack of opportunity to present evidence in response to it, to cross-examine the prosecuting witnesses on testimony supporting the new theory, or to argue before the trier of fact the theory's invalidity or inapplicability. [Citations.]"

■ The conduct of defendant observed by the arresting officers here was such that it would have been reasonable to arrest him for a violation of Penal Code section 647.[2] That argument was presented by the district attorney at the hearing of the motion to suppress.

But that observed conduct of defendant was also directly related to the type of crime that was the stated reason for defendant's arrest. That conduct gave reason for a strong suspicion reasonably and conscientiously held that defendant was surprised in an attempted burglary.

In *People* v. *Davis,* 24 Cal.App.2d 408, 409 [75 P.2d 80], the facts were as follows: "[A]t approximately 10 p.m., defendant was observed in front of the bedroom window of an inhabited dwelling, into which he had no permission to enter, with his hands upraised towards the window. It was so dark that it could not be told whether or not he was actually touching the window. There were coats and purses on the bed in the room. The defendant was standing between a hedge and the house, a space only three or four feet wide. Defendant was asked what he was doing there. Instead of answering, he ran away, leaving his car parked across the street." Those facts were thought sufficient to uphold a conviction of attempted burglary, the court saying, at page 410: "Approaching the window and raising of the hands either to open it or to reach through it would clearly be an overt act directly proceeding toward the consummation of the substantive crime."

Somewhat similar conduct was said to afford probable cause to arrest for attempted burglary in *People* v. *Superior Court (Johnson)* 15 Cal.App. 3d 146 [92 Cal.Rptr. 916].

---

[2]Penal Code, section 647, subdivision (h) declares guilty of disorderly conduct any person: "[w]ho, while loitering, prowling, or wandering upon the private property of another, in the nighttime, peeks in the door or window of any inhabited building or structure located thereon, without visible or lawful business with the owner or occupant thereof."

We do not say the evidence here would have been sufficient to uphold a conviction of attempted burglary of the apartment into whose window defendant was looking.

While in the case at bench Newberry testified he felt defendant was responsible for the series of burglaries and rapes that had occurred in the area, he made the arrest for burglary and so informed the defendant, but without specifying a certain burglary. Undoubtedly the officer's belief was based upon the particular conduct of the defendant just prior to the arrest, which, while it did not give probable cause for arrest for any particular one of the previously committed crimes, did give probable cause to arrest for a crime being committed within the observation of the arresting officers.

The observed conduct of the defendant was, therefore, the basis for his arrest and was related directly to the type of crime for which he was placed under arrest. It furnished the subjective reason for the arrest as well as probable cause for arrest viewed objectively.

Recognizing that the rationale of *Davis* v. *Mississippi, supra,* 394 U.S. 721, applies in any case in which the police take a fingerprint during an illegal arrest or detention, we point out the factual differences in *Davis* from those in the case before us, again without stating that such differences necessarily make the *Davis* rule inapplicable here.

The court in *Davis* recited these facts: "Beginning on December 3, and for a period of about 10 days, the Meridian police, without warants, took at least 24 Negro youths to police headquarters where they were questioned briefly, fingerprinted, and then released without charge. The police also interrogated 40 or 50 other Negro youths either at police headquarters, at school, or on the street. Petitioner, a 14-year-old youth who had occasionally worked for the victim as a yardboy, was brought in on December 3 and released after being fingerprinted and routinely questioned. . . .

"On December 12, the police drove petitioner 90 miles to the city of Jackson and confined him overnight in the Jackson jail. The State conceded on oral argument in this Court that there was neither a warrant nor probable cause for this arrest. The next day, petitioner, who had not yet been afforded counsel, took a lie detector test and signed a statement. He was then returned to and confined in the Meridian jail. On December 14, while so confined, petitioner was fingerprinted a second time." (Pp. 722-723 [22 L.Ed.2d pp. 678-679].) ■ ■ The fingerprints taken on

December 14 were found to compare with prints left at the scene of a rape of which Davis was convicted.

The police conduct in the *Davis* case cannot fairly be compared with that in the case at bench. The defendant here was not taken into custody in a purse seine operation, nor was he arrested with the motive to obtain his fingerprints.

Defendant here was arrested because he was detected in conduct and under circumstances that gave rise to very strong suspicion that he was abroad with criminal intent and had taken steps to effect an illegal entry from which it may be inferred he was diverted because he became aware of Bowman's presence on the north side of the fence just as Bowman had been able to see him through the fence.

From the differing facts in the *Agar, Miller* and *Simon* cases arises a necessity to distinguish such cases as those and such cases as that with which we deal.

Without attempting to state a rule of universal application, we may say, nevertheless, that where a person is arrested for conduct and under circumstances observed by the police giving probable cause to arrest for a type of crime that justifies arrest, search and booking in the jail, the arrest is lawful; and if the search made discovers evidence of another and earlier crime known to the police previously committed by the defendant, the discovered evidence may be used in the prosecution of the earlier-known crime, even though there had not been at the time of the arrest probable cause to arrest for the known earlier crime, and though in making the arrest the officer may have been mistaken as to the specific crime that was committed in the observed conduct which the officer had in mind as the basis of the arrest.

█ A court passing upon the question of probable cause to make a warrantless arrest reviews as it were the sufficiency of the evidence upon which the arresting officer acted in making the arrest. █ In a somewhat similar way, a court in passing upon a motion under Penal Code section 995 evaluates the sufficiency of the evidence presented to the magistrate to justify the charges contained in the information, including such charges as may have been contained in the magistrate's order committing the defendant for trial. But, subject to the provisions of Penal Code section 739,[3] the infor-

---

[3]Penal Code section 739 is as follows: "When a defendant has been examined and committed, as provided in Section 872, it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant which may charge the defendant with either the offense or offenses named in the order of com-

mation may go beyond the magistrate's order if the evidence presented to the magistrate supports such additional charge or charges (*People* v. *Tallman,* 27 Cal.2d 209, 214 [163 P.2d 857]; *People* v. *Azevedo,* 218 Cal. App.2d 483, 489 [32 Cal.Rptr. 748]; *People* v. *Dean,* 158 Cal.App.2d 572, 575 [322 P.2d 929]), including a charge for which the magistrate may have thought the evidence insufficient. (*People* v. *McGee,* 31 Cal.2d 229, 234 [187 P.2d 706]; *People* v. *Horton,* 191 Cal.App.2d 592, 597 [13 Cal.Rptr. 33]; *People* v. *Warren,* 163 Cal.App.2d 136, 141 [328 P.2d 858]; *People* v. *Sturman,* 56 Cal.App.2d 173, 177 [132 P.2d 504]; *People* v. *Shutler,* 15 Cal.App.2d 704, 707 [59 P.2d 1050].) The authority is statutory but the statute must be reasonable to afford due process, and it has been held constitutional under the due process requirements of the federal Constitution and under section 8 of article I of the California Constitution. (*People* v. *Bird,* 212 Cal. 632, 636-637 [300 P. 23].)

■ Similarly, it is reasonable that the court passing upon the sufficiency of the evidence upon which the policeman made his decision should find the arrest legal if the evidence that brought about that decision gave probable cause to arrest for a crime whose identity has been aired in the court hearing by either the prosecution or the court *sua sponte,* even if the policeman was mistaken as to nature of the crime whose commission was shown by the evidence upon which he acted. That should not be any less true though the question is passed upon in the prosecution of a different crime the defendant's connection with which has been discovered as a byproduct of the arrest, the corpus delicti of which was provable other than by the result of a search incident to the arrest.

The error of the committing magistrate aided by arguments of counsel, research and deliberation need not have a lethal effect upon a prosecution; it is reasonable the mistake of the less knowledgeable policeman in the field acting under the pressure of circumstances and time should have no such fatal effect.

■ Our task is to determine if there were error in the trial court's denial of the motion to suppress. If he did not so err, it is irrelevant that he may have made a correct decision for an inapplicable reason.

We hold probable cause to arrest defendant was furnished by the actions the police observed under the existing circumstances, and such conduct and circumstances were directly related to the subjective reasons for the arrest expressed by the arresting officer.

---

mitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed. The information shall be in the name of the people of the State of California and subscribed by the district attorney."

Defendant claims also that the trial should have been postponed until he had an opportunity to petition for a writ after denial of his motion to suppress, most of the testimony for which was heard, and which was decided on the day the trial commenced. The trial date had been set on December 20, 1971 for January 20, 1972, at defendant's request, and the motion was presented on that day and then continued to January 24 when the hearing was completed and the motion denied, after which the jury was empaneled.

Since we have concluded the motion was properly denied, there is no need to consider that contention.

The judgment is affirmed.

Ault, J., and Cologne, J., concurred.

A petition for a rehearing was denied February 1, 1973, and appellant's petition for a hearing by the Supreme Court was denied March 14, 1973.