**UNITED STATES of America,**
**Plaintiff,**

v.

**Benjamin E. HAMILTON, Defendant.**

**Cr. A. No. 1132–59.**

United States District Court
District of Columbia.

March 14, 1960.

Oliver Gasch, U. S. Atty., and John W. Warner, Jr., Asst. U. S. Atty., Washington, D. C., for the United States.

Wesley S. Williams, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is a trial on a charge of murder in the second degree. The trial is before the Court without a jury, as the defendant has waived his right to trial by jury.

The indictment avers that on or about December 2, 1959, within the District of Columbia, Benjamin E. Hamilton, with malice aforethought, murdered John W. Slye by means of striking him with his fists and stamping and kicking him with his shod feet. Specifically, the charge is that on the evening of December 2, 1959, the defendant and the deceased were in a fight on Lamont Street near Georgia Avenue in the City of Washington; that the deceased was knocked down in the course of the fight, and that then the defendant jumped on his face and kicked his face, inflicting wounds of which the deceased later died. The defense is that the wounds inflicted by the defendant on the deceased were not the cause of death.

The evidence in this case establishes the following salient facts. On the afternoon and evening of December 2, 1959, a number of men had gathered in a poolroom on Georgia Avenue near Lamont Street for the purpose of recreation. The defendant and the deceased were in that group. They played several games of pool. They imbibed intoxicating beverages in the rear of the establishment, and they also carried on desultory conversations. There was an exchange of banter between the deceased and the defendant, which developed into an argument, and finally into an acrimonious quarrel. The subject matter of the argument must have been trivial and inconsequential, because the defendant, although he narrated with a great degree of particularity the events of that evening, does not remember what the discussion was about. Both the deceased and the defendant were asked by the person in charge of the poolroom to leave, because it was undesirable that a fight should develop inside. Accordingly, both of them went outside and a fight started on Lamont Street. In the course of the fight, the deceased was knocked down by the defendant. While he was lying on the ground, the defendant apparently exploded in a fit of ungovernable rage and jumped on the face of the deceased and kicked him in the head as well.

The deceased was taken to the District of Columbia General Hospital, arriving there at 11:30 p.m. No useful purpose would be served by recounting the gory and harrowing details concerning the nature of the injuries sustained by the deceased to his face and head. Suffice it to say that he apparently was in a semi-comatose condition. He was violent and in shock. Blood was coming from his face.

Promptly upon arrival at the hospital, the deceased came into the competent hands of the Chief Resident of the Neurological Service, who impressed the Court as a completely dedicated and entirely devoted physician. He did everything possible that could be done for his patient. A blood transfusion was given to the deceased, his airways were cleansed, and tubes inserted into his nasal passages and trachea in order to maintain the breathing process. In view of the fact that he was violent, it was necessary to restrain the patient by fastening leather handcuffs on him. The doctor saw the patient several times during the night. In addition, the registered nurse in charge of the ward in which the deceased was placed, saw him at least every half hour or every thirty-five minutes. The deceased was in a room with only one other patient. A licensed practical nurse was constantly in attendance in that room. It is obvious that the patient received incessant and continuous care and treatment at the hands of both the medical and nursing staff of the hospital.

During the night it became desirable to change the bed clothes of the deceased, because they had become bloody. To accomplish this result, it was necessary to remove the restraints from the pa-

tient. They were not put back, because by that time, the patient was no longer violent and was resting better than when he arrived. About 6:30 in the morning, the patient had a convulsion, and immediately thereafter, he himself, with his own hands, pulled out the tubes. At 7:30 a.m., the patient died.

The Deputy Coroner, who performed the autopsy and who himself is an experienced physician, found the cause of death to be asphyxiation due to aspiration or inhalation of blood caused by severe injuries to the face, including multiple fractures of the nasal bones. The attending physician testified that the cause of death was asphyxia. In other words, the two physicians agree as to the cause of death. It should be said at this point that the purpose of the tubes was to assist in keeping the airways clear in order that the patient might breathe normally. It is claimed by able counsel for the defendant that the immediate cause of death was the fact that the patient pulled out the tubes, and that, therefore, he brought about his own death. This contention requires a consideration of the applicable principles of law.

■ It is well established that if a person strikes another and inflicts a blow that may not be mortal in and of itself but thereby starts a chain of causation that leads to death, he is guilty of homicide. This is true even if the deceased contributes to his own death or hastens it by failing to take proper treatment.

The principles of the common law on this subject are summarized in Hale's Pleas of the Crown, Volume 1, p. 427, in a passage that has been frequently quoted. He says:

"If a man give another a stroke, which it may be, is not in itself so mortal, but that with good care he might be cured, yet if he die of this wound within a year and a day, it is homicide or murder, as the case is, and so it hath been always ruled."

And, again, Hale says:

"But if a man receives a wound, which is not in itself mortal, but

either for want of helpful applications, or neglect thereof, it turns to a gangrene, or a fever, and that gangrene or fever be the immediate cause of his death, yet, this is murder or manslaughter in him that gave the stroke or wound, for that wound, tho it were not the immediate cause of his death, yet, if it were the mediate cause thereof, and the fever or gangrene was the immediate cause of his death, yet the wound was the cause of the gangrene or fever, and so consequently is *causa causati*."

Judicial decisions applying this doctrine are too numerous to require a review. Suffice it to say that these principles have been adopted and applied in the District of Columbia, in Hopkins v. United States, 4 App.D.C. 430, 439. In that case, the defendant had struck the deceased. Several weeks later the deceased died, and the autopsy showed that the death was caused by the blow that had been inflicted by the defendant. It was argued that the defendant was not guilty of homicide, because the deceased had neglected to take medical treatment after he was struck and that his failure to do so either caused or contributed to bringing about his death. This contention was overruled, and it was held that the mere fact that the deceased had neglected to procure proper treatment for the effects of the blow or wound did not relieve the defendant of his responsibility for the homicide.

Hawkins' Pleas of the Crown, Volume 1, Chapter 31, Section 10, summarizes this principle very succinctly. He says:

"But if a person hurt by another, die thereof within a year and a day, it is no excuse for the other that he might have recovered, if he had not neglected to take care of himself."

■ It is urged by defense counsel, however, that this case should not be governed by the principles just discussed, because, in this instance, the deceased was not guilty merely of neglect, but took affirmative action which contributed

to his death, namely, pulling out the tubes. The evidence is far from clear whether the action of the deceased in pulling out the tubes was a reflex action, or whether he was then only semi-conscious, or whether it was a conscious, deliberate act on his part. It is not necessary, however, to resolve this question of fact, because even if the act of the deceased in pulling out the tubes was conscious and deliberate, it would not help the defendant. First, there is not sufficient evidence to justify a finding that if the tubes had remained in the trachea and nasal passages of the deceased, he would have continued to live. Second, and quite irrespective of that consideration, even if it were to be assumed, *arguendo*, that the deceased might have lived if he had not pulled out the tubes, this circumstance would not have any effect on the liability and responsibility of the defendant for the death of the deceased.

In People v. Lewis, 124 Cal. 551, 559, 57 P. 470, 45 L.R.A. 783, the facts were as follows. The defendant inflicted a gunshot wound on the deceased. This wound was mortal. The deceased, however, procured a knife and cut his throat, and thereby brought about his death sooner than would have been the case if it had resulted from the original wound. The defendant was convicted of manslaughter, and the conviction was affirmed by the highest court of California.

An even more extreme case is Stephenson v. State, 205 Ind. 141, 183, 179 N.E. 633, 186 N.E. 293. There the defendant attempted to rape the deceased, and seriously, but not mortally, wounded her. She took poison and died as a result of the poisoning. The defendant was convicted of murder in the second degree, and the Supreme Court of Indiana affirmed the conviction. As against the argument in behalf of the defendant that there was no homicide, since the deceased took her own life by committing suicide, the Court held that the jury was justified in finding that the defendant by his acts or conduct rendered the deceased distracted and mentally irresponsible and that her taking poison was a natural and probable consequence of the unlawful and criminal treatment that the defendant had inflicted on the deceased.

Here the question before the Court is whether the defendant should be deemed guilty of homicide or guilty merely of assault with a dangerous weapon. As has been indicated by the Supreme Court, assault is a lesser included-offense in an indictment for murder, Logan v. United States, 144 U.S. 263, 307, 12 S.Ct. 617, 36 L.Ed. 429. Further, the Court of Appeals for this Circuit has held that shoes on feet are dangerous weapons, at least when they inflict serious injuries, Medlin v. United States, 93 U.S.App.D.C. 64, 207 F.2d 33. The Court is of the opinion, however, that the injuries inflicted on the deceased by the defendant were the cause of death in the light of the principles of law heretofore discussed, and that, therefore, the defendant should be adjudged guilty of homicide.

The next question is whether he is guilty of murder in the second degree or of manslaughter. The difference between murder in the second degree and manslaughter is found in the presence or absence of malice aforethought. If there was malice aforethought, this would be a case of murder in the second degree. If malice aforethought was lacking, it is manslaughter. Malice aforethought or malice, as it is sometimes called, is a word of art. Malice in the law of homicide denotes a vicious and wicked state of mind. It is sometimes described, somewhat picturesquely, as a heart fatally bent on mischief and unmindful of social duty. While this definition may be physiologically inaccurate, it is very descriptive. The Court is of the opinion that there was no malice in this case in the legal sense. Moreover, any reasonable doubt as to the nature and degree of homicide should inure to the defendant's benefit.

Accordingly, the Court finds the defendant guilty of manslaughter.