[Crim. No. 515. Fifth Dist. June 13, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. EDDIE GENE DILWORTH et al., Defendants and Appellants.

H. W. Bailey, under appointment by the Court of Appeal, and Jerry C. Duke for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Stephen Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

GARGANO, J.—Eddie Gene Dilworth, Joe Sonny Ray and Ernest V. McPeters were charged with the armed robbery of a Norwalk service station and with murder of the attendant, Harry Trowbridge. They were tried at the same time, and each was convicted on both counts. Dilworth and Ray have appealed.

The facts developed at the trial are these: On December 16, 1966, at about 6:40 in the evening, Darla Duff was riding in a car with her parents and a friend. As they passed a Norwalk service station located in the vicinity of Annadale and Elm Streets in Fresno, she looked inside and saw the attendant, a white man, being robbed by three Negroes. The robbers appeared to be 19 or 20 years old. The one who held the pistol was dressed in dark clothing, and the one standing to the right of the victim wore a light colored scarf on his head.

A few minutes later Marion Abbs stopped at the service station for gasoline. He discovered the attendant, Harry Trowbridge, lying in the doorway, his face bloody. Abbs spoke with Trowbridge and then went to a nearby market to call the police.

Shortly after Abbs left, Edward Farrell approached the station on foot. He found Trowbridge lying on the floor near the doorway. Trowbridge told Farrell he had been robbed and that the robbers had beaten him with their fists. He said the robbery was committed by four men between 18 and 22 years of age, and that one of the robbers had shot at him but he did not know if he was hit. Farrell opened Trowbridge's jacket and shirt and found a bullet hole just below the ribs on the victim's right side. Then Farrell called the police.

Deputy Sheriff Frankfort of the Fresno County sheriff's office arrived at the station at 6:55 p.m. Trowbridge was lying on his left side on the floor just inside the door. There were abrasions and blood on his face. His pockets were turned inside out, and he appeared to be in considerable pain. However, he seemed rational and unexcited. Trowbridge told the officer that he did not know who his assailants were, and that he had not heard or seen a vehicle either before or after the robbery. He said the robbers were four Negro males 18 to 20 years old, and the gunman was wearing black pants, a black shirt or jacket, and a black hat. Trowbridge described the gun as a small chrome revolver, possibly a .22 or .25 caliber. After Trowbridge was removed from the station and taken to the hospital, four empty cartridges were found on the station floor. Trowbridge died at about 9:30 p.m. The cause of death was assessed to cardiac arrest and loss of blood brought about by a rupture of the vena cava, the main venous channel that lies to the right of the spinal column and returns blood from the lower part of the body to the heart.

Eddie Gene Dilworth, Joe Sonny Ray and Ernest V. McPeters were at the home of a girl friend, Alice McFarland, at various times between 6 and 7 o'clock on the evening of the robbery. Miss McFarland's home is located about three-fifths of a mile from the Norwalk service station. At about 7 p.m. Ray met a friend, Mathew Lollis, in the hallway and handed Lollis a chrome .25 caliber automatic pistol with three shells in it. Lollis gave the gun to Richard Lee who placed it in the trunk of his car.

Later, around 7:30 p.m., Dilworth and McPeters went for a

ride with Richard Lee in Lee's automobile. They were accompanied by three girls, Barbara Brown, Novella Prater and Glenda Joyce Brown. Dilworth suggested that they "go down by the filling station and see what's happening." As they approached the Norwalk station Novella saw several police cars in the vicinity and asked Dilworth what had happened. He replied, "We robbed the filling station." Then McPeters stated that he (McPeters) had "started to hit the man but Eddie Gene shot him." To this Dilworth added that he shot the attendant because he would not give him the money, but he thought that he was not dead. Novella Prater asked Dilworth whether he had shot the white man or the colored man, and he answered "the white man." Dilworth also volunteered that the police had no evidence against him because he had the gun and the money and had not touched anything else.

Later that evening Dilworth again told Richard Lee that he had shot the attendant of the Norwalk service station but hoped that he did not die. At the time Dilworth and McPeters were the only passengers in Lee's car. Then Lee parked the car in a Regal service station where Dilworth and McPeters began to argue. A witness, Willie Packer, who was in the service station, said that McPeters asked Dilworth, "Why did you shoot the man?" Dilworth told McPeters to "shut up" or he would shoot him. McPeters asked when they would split up the money, and Dilworth replied it would be when he was "good and ready."

On the following morning, Saturday, December 17, Joe Sonny Ray asked his friend Johnny Williams if he had heard about the robbery and killing that occurred the night before. When Williams answered that he had not, Ray told him that he had been there and said, "I killed somebody last night." He also said he was going to go home to get some clothes and money and leave town.

On the same day Dilworth and McPeters went to a liquor store with J. D. Robinson. Robinson said, "I heard you guys got a little piece of money last night." Dilworth and McPeters laughed and Dilworth said, "Yes, we got a piece of money last night."

Also, on the same day Richard Lee took the pistol he received from Mathew Lollis to a place along North Avenue and fired it three times at a beer can. Later the police found three spent bullets and three empty cartridges in the vicinity where

Lee said he fired the gun. A comparison of the three bullets with the bullet taken from Trowbridge's body and the three empty cartridges with the empty cartridges found on the floor of the gas station disclosed that all four bullets and cartridges came from the same weapon.

Appellant Dilworth contends that the evidence was insufficient to support his conviction on the murder charge, because respondent did not prove that Trowbridge's gunshot wound was the proximate cause of his death. He asserts that under ordinary circumstances a rupture of the vena cava results in immediate death and theorizes that since Trowbridge died almost four hours after he was shot, the rupture must have been caused by the surgeon who performed the emergency operation, not the bullet.

Dilworth's theory is pure conjecture and nothing more. Moreover, it contradicts the only medical testimony on the subject. Dr. Thomas Hewlett, chief of surgery at the Fresno General Hospital, testified that the bullet was found embedded in the bone of the spinal column and that the victim's vena cava was totally disrupted for about 6 inches of its length and that the entire wall of that vessel was missing except for a thin strand of tissue connecting its two ends. The doctor emphatically denied that the rupture was caused during the operation and opined that the bullet entered the chest, nicked the margin of the liver, penetrated the small bowel and ruptured the vena cava.

In any event, even if we should assume that the rupture of the victim's vena cava was due to the negligence of the operating surgeon, it would still not absolve Dilworth of the crime of murder. Manifestly, the gunshot wound was the proximate cause of the emergency operation, and it is settled that " ' [w]hen a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide.' " (*People* v. *McGee*, 31 Cal.2d 229, 240 [187 P.2d 706].)

Dilworth next contends that respondent's evidence connected him to the robbery through his own admissions and that this evidence was insufficient to justify his conviction. He argues that it is inherently improbable that he would have admitted such a serious crime before so many persons. He also

points to the fact that several of the prosecution's key witnesses were impeached and apparently suggests that this in turn emphasizes the inherent improbability of their testimony. Glenda Joyce Brown admitted at Dilworth's preliminary hearing that she told defense counsel that her statement to the police was untrue and that she wanted to change her testimony. Novella Prater made at least one request to change her testimony and admitted that she was influenced by the fact that she might become involved. Richard Lee inconsistently testified at the preliminary hearing that no statements concerning the robbery or killing were made to him or in his car on the evening of the murder. Willie Packer volunteered that his testimony concerning the argument which he said took place between Dilworth and McPeters at the Regal service station was a lie because the police officers promised to help him in a pending grand theft charge.

It is of course true that it is not natural for a person to freely and repeatedly admit a robbery and possible murder. However, criminal behavior is of itself unnatural. Thus, it cannot be said that the testimony relating to Dilworth's behavior in this respect was inherently improbable. Moreover, there was ample circumstantial evidence to corroborate his incriminating statements. The Norwalk service station was robbed by four Negroes who appeared to be between the ages of 19 and 20 years. Dilworth, Ray and McPeters are young Negroes. One of the robbers was wearing dark clothing. Joe Sonny Ray was wearing a dark coat and hat on the evening of the robbery. The robbery was committed between 6:30 and 6:40 p.m., and the robbers were apparently on foot. Dilworth, Ray and McPeters were all seen at various times between 6 and 7 p.m. at the home of Alice McFarland, a short walking distance from the Norwalk service station. The victim described the gun which was used in the robbery as a small chrome revolver. The gun which Joe Sonny Ray handed to Mathew Lollis was a small chrome revolver, and the bullet found in Trowbridge's body was traced to that gun.

It is also true that several key prosecution witnesses were impeached by defense counsel. ■ However, the credibility of the witnesses is for the jury to determine, and the jury may accept or reject all or any part of a witness's testimony unless the testimony is inherently incredible (*People* v. *Lyons,* 47 Cal.2d 311 [303 P.2d 329]; *People* v. *Aubrey,* 253 Cal.App. 2d 912, 916 [61 Cal.Rptr. 772]; *People* v. *Fuentes,* 253 Cal. App.2d 969 [61 Cal.Rptr. 768]). ■ As we have demon-

strated, with the possible exception of Willie Packer, the testimony of the witnesses who were impeached was not inherently incredible. Moreover, there are at least two possible explanations for the inconsistency in their testimony. The record suggests that some of the witnesses may have been afraid of the defendants, and others may simply not have wanted to become involved in the case.[1]

■ Dilworth's third contention is that his blood-stained pants were improperly admitted into evidence without proof that the blood stains came from the victim's body or that he had worn the pants on the evening of the robbery.

There is no merit to this contention either. Although the trousers were not of themselves sufficient to connect Dilworth to the robbery, they were a logical link in the chain of evidence bearing upon his identity as one of the robbers and hence had probative value (*People* v. *Adamson,* 27 Cal.2d 478 [165 P.2d 3]). The victim was beaten about the face and head before he was shot; blood stains were found on the floor where he had lain and in various other places in the station. Moreover, Professor Paul L. Kirk of the School of Criminology, University of California at Berkeley, testified that the stains were made by coagulated blood and were in an awkward position for the person who wore the trousers to reach with his hands. He said the stains probably came from an object (such as the victim's head) on which there was coagulated blood.

Dilworth's fourth contention is that the prosecutor was guilty of prejudicial misconduct. He alleges that the method of questioning the young Negro witnesses was such as to induce fear of punishment or hope of immunity from punishment. However, he cites no instances of such questions nor have any been found by our own examination of the record. ■ He maintains that the prosecutor called Willie Packer as a witness with knowledge of the grand theft charge pending against him. Bad reputation or pending charges do not disqualify a witness from testifying (*People* v. *Cowan,* 38 Cal. App.2d 231, 241 [101 P.2d 125]). ■ He argues that the prosecutor consistently bickered with defense counsel and made disparaging and belittling remarks. The remarks were relatively innocuous and were ordered stricken from the record with the admonition to the jury to disregard them.

---

[1]For example, Dilworth's mother allegedly called Novella Prater and told her Dilworth wanted her to change her testimony. Richard Lee stated that his prior inconsistent testimony was due to the fact that he was afraid he might become involved in the case.

■ He charges that the prosecutor read into the record the prior testimony of witnesses (apparently for impeachment purposes) without demonstrating that it was done in bad faith and while conceding that no objection was made on this ground at the trial. ■ Misconduct means reprehensible conduct, and unless it is of such nature that it cannot be cured by an appropriate admonition to the jury the objection cannot be raised for the first time on appeal (*People* v. *Cruz,* 260 Cal.App.2d 55 [66 Cal.Rptr. 772]; *People* v. *Lint,* 182 Cal. App.2d 402 [6 Cal.Rptr. 95]).

■ Dilworth's final contention is devoid of merit and need not detain us long. He complains because the court instructed the jury not to consider against the other defendants (hearsay) evidence which was properly received against only one defendant. However, the instructions (CALJIC 39 and 39-A) were pertinent and accurate and were requested by appellants (*People* v. *Ray,* 252 Cal.App.2d 932 [61 Cal.Rptr. 1]).

■ We turn next to the contentions of appellant Joe Sonny Ray. He cites *People* v. *Johnson,* 68 Cal.2d 629 [68 Cal.Rptr. 441, 440 P.2d 921], and argues that the trial court violated his Sixth Amendment right of confrontation by allowing the prosecutor to read into the record the extrajudicial statements of witnesses who testified during the trial. In *Johnson* the trial judge relied on Evidence Code section 1235 and instructed the jury to consider certain extrajudicial statements offered by the people to impeach their own witnesses ''in the same light and in accordance with the same rules which you have been given as to the testimony of witnesses who have testified here in court.'' However, in reversing the conviction the California Supreme Court declared section 1235 unconstitutional to the extent that it impinges upon a defendant's Sixth Amemdment right of confrontation by allowing the trier of fact to consider prior inconsistent statements of witnesses as substantive evidence.[2]

We note at the outset that with one exception the extraju-

---

[2] See *People* v. *Green,* 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422], wherein the court extended the so-called *Johnson* rule to prior inconsistent statements made during defendant's preliminary hearing.

We also note parenthetically that appellant's trial counsel did not object to the reading of the statements nor did he request the trial judge to admonish the jury to consider the statements for rehabilitation or impeachment purposes only. However, appellant's trial was completed prior to the *Johnson* decision, and hence the constitutional question may be raised for the first time on appeal. (See *People* v. *Vinson,* 268 Cal. App.2d 672, 675 [74 Cal.Rptr. 340].)

dicial statements to which appellant Ray refers in his brief were prior consistent statements offered by the prosecutor to rehabilitate witnesses who were impeached by the defense through the use of inconsistent statements, and prior inconsistent statements of defense witnesses relating to minor details which had little if anything to do with implicating Ray and Dilworth with the crimes charged. Thus, it should have been reasonably clear to the jury that these prior statements were not offered as substantive evidence but to be considered only in judging the credibility of the witnesses according to the only instruction which the trial judge gave on the subject; the trial judge instructed the jury that they could consider the prior ''consistent'' or ''inconsistent'' statements of witnesses among other factors in judging their credibility.

 A closer question is presented as to the prior inconsistent testimony of Roy Prater. Prater testified that he saw two people in the hallway, that one of the persons handed something small to the other, and that one of these persons was Mathew Lollis. He said he could not see the other person because the hallway was dark. Then the prosecutor read Prater's prior testimony given at the preliminary hearing to the effect that the other person in the hallway was appellant, Joe Sonny Ray.

A reversal of the judgment is not required under the *Johnson* rationale. First, the prosecutor did not suggest to the court or the jury that Prater's prior testimony was offered as substantive evidence. On the contrary, he plainly indicated that he was reading the testimony to refresh the witness's memory. Second, the trial judge did not (as in *Johnson*) inform the jury that they could consider Prater's prior testimony as substantive evidence. The judge instructed the jury that prior inconsistent statements of the witnesses could be considered by them in judging the witnesses' credibility. Third, Mathew Lollis testified that it was Ray who met him in the hall and gave him the gun. Thus, respondent established by independent evidence that the ''other'' person Prater saw in the hall with Mathew Lollis was Joe Sonny Ray; and it seems clear beyond a reasonable doubt that the jury would have reached the same result even if the trial judge had immediately admonished them to consider Prater's prior inconsistent statement for impeachment purposes only.

 While conceding that this is not a death penalty case, Ray's final contention is that he was deprived of a fair

trial because jurors who had conscientious scruples against the imposition of the death penalty were automatically excluded. In short, he attempts to extend the rationale of *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], to the guilt phase of his murder trial. It suffices to point out that an essentially similar argument was rejected by the California Supreme Court in the recent case of *People* v. *Durham,* 70 Cal.2d 171, 198 [74 Cal.Rptr. 262, 449 P.2d 198].

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.

The petition of appellant Dilworth for a hearing by the Supreme Court was denied August 6, 1969.