Lonnell **PETTIGREW,** Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–76–218.

Court of Criminal Appeals of Oklahoma.

Sept. 20, 1976.

13. *First National Bank v. Gillam,* 134 Okl. 237, 273 P. 261 (1929).

**1188**

Ronald Mook, Sondra Fogley, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Frank Muret, Asst. Atty. Gen., Kenneth Lisle, Legal Intern, for appellee.

## OPINION

BLISS, Judge:

The Appellant, Lonnell Pettigrew, hereinafter referred to as defendant, was charged and tried before a jury for the crime of Murder in the Second Degree in the District Court of McCurtain County, Case No. CRF–75–40. The jury found the defendant guilty of Manslaughter in the First Degree and assessed punishment at a term of six (6) years under the direction and control of the Department of Corrections of the State of Oklahoma. From a judgment and sentence in accordance with said verdict the defendant has perfected her timely appeal.

Briefly stated the evidence adduced at trial is as follows: Valliant Police Officer Roy Wiggins testified that at approximately 5:20 a. m. on the morning of February 28, 1975, he received a call from the defendant stating that her husband had been shot by prowlers. The officer proceeded to the Pettigrew residence and found George Pettigrew, defendant's husband, on the bathroom floor leaning against a wall. He was bloody and appeared to have been shot in the chest area and had a scalp wound. The victim was conscious and talked to the witness. The blood appeared to be "dried over." The officer found a pair of men's pants with a gun and holster on the belt lying outside the bathroom door. The officer then assisted the victim to an ambulance. Subsequently the witness returned to the residence and found no evidence of a break-in or attempted break-in.

McCurtain County Deputy Sheriff J. W. Fields then testified he received a call from Officer Wiggins at approximately 5:20 a. m. on the 28th. He proceeded to the Pettigrew residence where the defendant told him that prowlers had shot her husband outside and that she had helped him inside. Upon examination of the home Fields found a .32 revolver with four live and three spent rounds and a bullet embedded in a wall in the living room. In the bathroom he found the victim who was coherent and could be understood but was breathing hard. An ambulance was called and the victim was assisted to it. Fields described the blood on the person of the victim as being dry and said the victim assisted in getting himself to the ambulance. Fields further testified that he found blood stains on the arm of a couch in the living room near the bullet hole, that there were other guns in a gun rack in the living room area, and that he examined the front porch and the outside of the house and found no evidence of a break-in.

The state then called ambulance attendant Larry Zier who stated that when he arrived he found the bathroom door too narrow for a stretcher and that the victim scooted out the door under his own power. In the ambulance he was conscious although his breathing was irregular. The

defendant accompanied the victim to the hospital. He further quoted the defendant as stating that her husband was a hero and that he had been shot by prowlers. On cross-examination Zier testified that he saw no indication that the victim was in shock.

The state then called Dr. L. L. Duncan, a licensed pathologist, who testified that he performed an autopsy on the body of the victim on March 3, 1975, and that he found a scalp wound caused by a bullet and another bullet wound in the anterior chest. He further stated that the bullet in the chest penetrated the fibrous cover that surrounds the heart and that the victim had bled over a period of time into the sack in which the heart is contained. The bleeding caused pressure on the heart, squeezing it down so that it no longer functioned properly. In his opinion the victim died as a result of complications of a gunshot wound to the chest. On cross-examination Dr. Duncan testified that a tube had not been inserted into the heart sack area to drain excess fluid. He further testified that there was a surgical procedure which could have repaired the wound to the heart sack but said procedure had not been followed.

Dr. David E. Rutledge, the treating physician, then testified that he first saw the patient at approximately 6:35 a. m. on the 28th and that the patient was in a confused and apprehensive condition although his temperature and blood pressure were within normal limits. After determining that the victim had suffered gunshot wounds, surgery was performed wherein a tracheotomy tube was inserted into the chest area and a head wound was sutured. The victim remained under the doctor's care until March 2, 1975, when he died at approximately 6:30 a. m. He further testified that the wound to the chest ordinarily would be expected to be fatal, that the patient's condition was favorable for approximately 36 hours and that he then began "spiking fever" and died. On cross-examination the doctor stated that at the time the victim was admitted into the emergency room his condition was stable except for blood in the chest, that there was sufficient blood circulation and that he did not appear to be in shock. He further stated that he did not undertake investigative action to determine whether or not the heart sack was involved although he was aware that blood in the heart sack can compress the heart and stop its function. He further stated that according to hospital records no physician attended the victim for the thirteen (13) hours prior to his death.

Imogene King, the victim's sister, then testified that she visited her brother in the hospital on several occasions, the first being on the 28th while he was in intensive care. She described him as having difficulty breathing and that his "neck was so big around and blood was flying out of this hole in his neck." At that time he asked her in a whisper if she thought he would "make it" and stated that she could pray for him. She visited him on other occasions while in intensive care and each time he asked her to pray and if she thought he would "make it". Over objections of defense counsel she then described her last private conversation with her brother on March 1st as follows:

Q. And did you say anything to him at this time?

A. Yes, sir. I said, "How are you?" And he didn't say anything. He just kind of shook his head.

Q. Then did he say anything to you again?

A. He asked me if I had talked to the doctor and I said, "No, I haven't. I will let the girls do that when they come."

Q. What else did he say to you?

A. He said, "Do they think I'll make it?" And he said "pray, pray."

Q. Did you say anything to your brother after that?

A. Yes, sir.

Q. What did you say?

A. I said, "Do you feel like me asking you a question?" And he nodded his head.

Q. Did you ask a question?

A. Yes, sir, I did, I said, "Could you tell me who did this?" And he said, "Lonell did this." I said, "But, Bud, she said she didn't do it." And he said, "She did this."

Q. Did he ever make any motions of any kind as well as talking?

A. Not right then.

Q. Did he later?

A. He did later. At this time the two nurses came over and talked with him.

Q. All right. Did the nurses remain at the bedside?

A. Not very long.

Q. Did you stay with your brother after the nurses left?

A. Yes, sir, I did.

Q. Did he say anything to you after that?

A. He picked up a glass of ice on the right side and wanted me to give him some chipped ice and I did and he set it back down himself and I said, "Could I ask you another question?" And he nodded his head. I said, "Were you fussing or arguing or anything of that sort?" And he said, "No, no." Shall I go ahead?

Q. Yes.

A. He said, "I was lying on the couch watching TV and I went off to sleep. Now, this was gasping, and of course not talking like I am, but he said, "She got gun and shot me in the head and I tried to get up and when I did she shot me here." Now, he motioned with his right hand, all of this with his right hand.

Q. Did he say anything else after that?

A. He said, "She held gun on me all night and wouldn't let me get help," or "wouldn't get help." The two I never understood whether he said wouldn't get help or wouldn't let me get help.

On cross-examination Ms. King testified that her brother had a bad temper and that she had seen him whip his daughter with a belt. Ms. King then stated that during her visits to the hospital her brother never told her that he was in pain or that he was afraid, that he never used the word "death" or "die"; that after her first visit the victim seemed to be in better spirits and improving and that on her first visit her brother accused no one. The state then rested.

For the defense the defendant, testifying in her own behalf, stated that she married the victim in November 1973, that the victim was extremely jealous; that he had threatened her numerous times with a loaded shotgun stating that he would kill her and her children if she left him; that the victim had struck her on numerous occasions and had even hit her after she had had surgery and was still in the hospital; that she was afraid of him; that he was cruel to animals on the ranch and to her pets and that he habitually carried a gun. She further stated that her husband was a large man weighing approximately 225 lbs and that when she did resist or talk back he would slap and choke her. She further stated that before the victim got his .32 pistol he would hold a shotgun on her and make jealous accusations.

Concerning the events surrounding the shooting, the defendant testified that on February 27 the victim accused her of wearing dresses too short and of flirting with the preacher. She then decided to go to bed in hopes the victim would leave her alone. However he followed her into the bedroom and began to choke her. When she recovered her voice she told the deceased that he "had better go ahead and kill me because when it came daylight I was going to leave." The victim then went into the front room and loaded the shotgun. The defendant followed him into the living room, found the loaded .32 pistol

which she had never fired before and begged him to put the shotgun away. When he finished loading the shotgun he pointed it at her and she fired. She did not remember how many times she fired the pistol but stated that the victim fell in the hallway and asked her to help him into the bathroom. When she told him she was going for help he said "No, I don't want to go to the hospital." He then began to pray and beg for her forgiveness. When she told him an ambulance was on the way he replied "Honey, they'll put you in jail." He then told her to wipe the fingerprints off the pistol, put it in the holster in his pants, take the shotgun and pick it up with a cloth and put it back in the rack and tell investigators that a prowler had shot him and that she had found him near the front porch of the house. She further stated that the blood found on the sofa had come from a cut which the victim suffered a month before the incident. She then described the victim as lunging at her at the time she fired and stated that he fell once and got back up and started after her again and that she fired again after which the victim remained down.

On cross-examination the defendant stated that she didn't want to fire the pistol, that she did not want to kill the victim but only wanted him to stop hurting her and that she was in fear for her life and knew that he was getting a shotgun to kill her. She further stated that while her husband was in the bathroom on the floor he never indicated that he thought he was going to die.

The defense then called Claudine Elledge who testified that her husband worked for the victim on his ranch in Valliant, that in late 1974 she witnessed arguments and fights between the victim and the defendant during which time the victim threatened to kill the defendant, that the victim was very jealous, that at one time she had seen red marks on the defendant's neck and that the victim often carried a gun. She further stated that on one occasion the defendant told her that the victim had pulled a gun on her. On cross-examination the witness stated that she had never seen the defendant get mad; had never heard her threaten the victim and had never seen the defendant throw a fit of temper.

Clifford Elledge, husband of the last witness, then testified concerning the victim's bad temper and his cruel treatment of animals, including the stomping of a dog and the beating of a horse with a hammer. He further stated that the victim had once told him that if the defendant was going to leave him he would kill her and that the victim usually carried a gun.

Lisa Todd then testified that her husband worked on the ranch, that she had seen the victim pinch the defendant quite often; that he usually wore a gun; that he was jealous of the defendant and that he would not let her go anywhere. Wayne Todd then testified to essentially the same matters as his wife.

Rubby Foster, the defendant's sister, then testified that while her sister was in the hospital after surgery she saw the victim slapping her and that the doctor was afraid to release her sister for fear the victim would kill her. She further stated that she had seen bruises upon the defendant's neck and body and that once during the defendant's absence the victim had told her if he found the defendant he was going to kill her. The defense then rested.

On rebuttal the state again called Deputy Fields who stated that he arrived at the Pettigrew residence about 5:30 a.m. on the 28th and went straight to the bathroom where the victim was lying. He was the first officer to arrive at the Pettigrew residence. Over strenuous objections of defense counsel he then related the following conversation with the victim:

"I asked Mr. Pettigrew where he was shot and he told me in the chest and in the head and I ask him did he know who did it and he told me it was his wife that shot him and to be careful and to watch those other guns."

He further testified that he checked every gun in the house and that none of them was loaded.

The defendant's first assignment of error urges that the trial court erred in overruling the defendant's objection to the rebuttal testimony of Deputy Fields concerning statement made to him by the victim outside the presence of the defendant for the reason that same was improper rebuttal and the testimony constituted hearsay.

■ With reference to improper rebuttal this Court recently held in *Schneider v. State*, Okl.Cr., 538 P.2d 1088, that rebuttal testimony may be offered to explain, repel, counteract, disprove or destroy facts given in evidence by an adverse party, as well as to clarify a disputed point, notwithstanding that the same testimony might have been introduced in chief, and that the introduction of such evidence is a matter of discretion for the trial court which will not be a ground for a reversal absent an abuse thereof. See also *Henderson v. State*, Okl.Cr., 389 P.2d 363.

■ In the instant case the defendant testified that she was told by her husband to tell authorities that he had been shot by prowlers and that he would swear to that story. The rebuttal testimony offered by Deputy Fields tends to repel and disprove that testimony.

With reference to the objection concerning hearsay it is obvious that the statement made by the victim to the Sheriff outside the presence of the defendant was in fact hearsay. It is therefore necessary for us to determine whether said statement comes within one of the generally accepted exceptions to the hearsay rule.

■ As stated in *Wolf v. State*, Okl. Cr., 375 P.2d 283, statements which are a part of the res gestae are admissible as an exception to the general hearsay rule. The term "res gestae" means the events themselves speaking through the instinctive words and acts of the participants, the circumstances, the facts and declarations growing out of the main fact, contemporaneous with it and serving to illustrate its character. Declarations to be a part of the res gestae need not be precisely coincident in point of time with the principal fact. If they spring out of it, shed light upon and tend to explain it, are voluntary and spontaneous and are made at a time so near it as to preclude the idea of deliberation or fabrication then they are to be regarded as contemporaneous and are admissible. See also *Hathcox v. State*, 94 Okl.Cr. 110, 230 P.2d 927. The courts can only deal with the subject of the res gestae exception to the hearsay rule of evidence in the light of the facts of each particular case when the occasion arises. *Carnes v. State*, 14 Okl. Cr. 585, 179, 475. An examination of the facts in the instant case shows that Deputy Fields and Officer Wiggins were notified by the defendant at approximately 5:20 a.m. that her husband had been shot by prowlers. They immediately went to the Pettigrew residence where Deputy Fields went in the bathroom to find George Pettigrew with gunshot wounds to the chest and head. Immediately the deputy asked what happened and then testified as follows concerning the victim's reply:

"I asked Mr. Pettigrew where he was shot and he told me in the chest and in the head and I asked him did he know who did it and he told me it was his wife that shot him and to be careful and to watch those other guns."

It is our opinion under these particular circumstances that the statement made by the victim was a part of the res gestae. It was a simple statement and not a long narration, the victim had just suffered two serious wounds under obviously traumatic circumstances and the victim still remained in the home where the shooting took place. The defendant's first assignment is without merit.

Defendant next urges that the trial court erred in overruling defense objections to the testimony of Imogene King as to those statements made to her by the victim out of the presence of the defendant. The defense argues that said statements were

hearsay and were not admissible as dying declarations. We agree.

Dying declarations are statements of material fact concerning the cause and circumstances of a homicide made by the victim under the solemn conviction of impending death. *Hampton v. State*, Okl.Cr., 407 P.2d 210, and *Graham v. State*, 80 Okl.Cr. 159, 157 P.2d 758. Dying declarations have also been defined as statements of material facts concerning the cause and circumstances of a homicide made by the victim under the fixed and solemn belief that his death is inevitable and near at hand. 40 C.J.S. Homicide § 286.

In the instant case there is no indication that the statements made by the victim to his sister Imogene King were made at a time when he was under the solemn and fixed conviction that his death was inevitable and near at hand. His sister's last visit was made some fifteen hours prior to his death and after he had been in the hospital for approximately one and one-half days and showing signs of recovery. There is nothing in the entire record to indicate the victim at any time was resigned to the fact that he was soon going to die.

The narrative statement of the victim made to his sister outside of the presence of the defendant was therefore inadmissible. Since those statements are most prejudicial to the defense their admission constituted reasonable error.

The defendant's brief further urges that the trial court erred when it limited the defendant's closing argument to exclude any reference to the opinions of the defense that the cause of death was unskillful or erroneous medical treatment and that at the time of death the bullet wound inflicted by the defendant did not contribute to the defendant's demise. In all particulars we must disagree.

In *Chase v. State*, Okl.Cr., 382 P.2d 457, this Court, citing *Baker v. State*, 65 Okl.Cr. 136, 83 P.2d 586, stated that one who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The following is found in 40 C.J.S. Homicide § 11c:

"One who has inflicted an injury which is dangerous, that is, calculated to destroy or endanger life, is not relieved of responsibility by the fact that the immediate or a contributing cause of the death was erroneous or unskillful medical treatment or care of the injury by deceased, or by a physician, or by nurses or other attendants. Thus it is not a defense that the victim died during or as the immediate result of a surgical operation rendered necessary by the existence of the wound, or that there was a possible mode of treatment which might have averted death, or that deceased might have recovered if he had submitted to an operation, or had adopted a different diet."

Therefore, since the failure of the treating physician in the instant case to examine the heart sack area and perform certain medical procedures which purportedly would have alleviated the malfunction of the heart was not a defense, the trial court did not err in limiting the closing argument in the manner complained of by the defense unless the death resulted solely from the erroneous treatment. After a thorough examination of the record it is our opinion that the bullet wound to the chest in the instant case contributed manifestly to the death of the victim and the trial court did not err in limiting the closing argument.

The defendant's last assignment of error urges that the trial court erred in submitting to the jury Instruction No. 11 which reads as follows, to-wit:

"On the trial of a person charged with murder, the commission of homicide by the defendant being proven or admitted, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution shows that the crime committed amount-

ed only to manslaughter, or that the defendant was justifiable or excusable."

It is noted that the instruction complained of is essentially a verbatim quote of 22 O.S. § 745. In *Meadows v. State*, Okl.Cr., 487 P.2d 359, this Court held that § 745 was a statement of trial procedure and not a statement of substantive law sufficient to overcome the fundamental conception pertaining to the rights of an accused regarding burden of proof or presumption of innocence. Therefore, relying on the logic of *Meadows* it is our opinion that the trial court erred in submitting said instruction over the objection of the defendant, since it tends to imply that the defendant, once the homicide is proved or admitted, must provide proof sufficient to raise a reasonable doubt of guilt. The submission of said instruction was error.

After an examination of the record and considering the briefs of both parties it is our opinion for the reasons set out above that the judgment and sentence appealed from should be and the same is hereby REVERSED and REMANDED for new trial consistent with the terms and tenor of this opinion.

BRETT, P. J., and BUSSEY, J., concur.