Paige T. BAYLOR, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 12534.

District of Columbia Court of Appeals.

Argued Sept. 27, 1978.

Decided Oct. 19, 1979.

David M. Barrett, Washington, D. C., for appellant.

John A. Terry, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, and Frederick A. Douglas, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before KERN, GALLAGHER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

█ This appeal raises questions on the issue of medical treatment as an intervening cause of death of the victim in criminal homicide cases. Appellant was charged with second-degree murder[1] and was convicted of the lesser-included offense of involuntary manslaughter. The government's evidence showed that appellant struck his wife (Mrs. Baylor) in the side with great force, thereby rupturing her spleen and causing severe internal bleeding.[2] Mrs. Baylor was taken to the hospital and operated on, but died thirteen days later from complications. There was testimony by one government medical witness on cross-examination that but for a two-hour delay in treatment at the Washington Hospital Center, and a laceration in her pancreas which surgeons at the Center might have caused while removing her spleen, Mrs. Baylor's chances of survival would have been good. On the basis of this testimony appellant requested an instruction on intervening gross negligence in medical treatment at the close of all the evidence. This request was denied. The trial court also declined to permit closing argument on what might have happened to Mrs. Baylor had she gotten better medical care.

█ On appeal, appellant contends "the trial court's refusal to instruct the jury on intervening contributing causation and its refusal to permit the jury to consider the issue affected the very ability of the jury to give [a]ppellant a fair trial." He also contends the trial court erred in not permitting the medical examiner to testify concerning the effect of the two-hour delay in treatment on Mrs. Baylor. His final contention

1. D.C.Code 1973, § 22–2403.

2. One government medical witness testified that Mrs. Baylor's injuries could only have been caused by a "severe blow" such as someone "getting hit with a baseball bat." Appellant and a neighbor testified that the blow was a slight and inadvertent brush with appellant's hand. However, an accidental touching of this type is not criminal, and the fact remains the jury convicted of manslaughter. Accordingly, we address intervening cause only as it relates to the evidence that the blow was non-accidental.

Appellant urges "the type of intent or recklessness necessary for conviction of manslaughter is lacking here." This is without merit. The government's medical testimony was ample to support a finding of recklessness. Moreover, the neighbor's testimony that the blow was a mere brush with the hand was impeached by a prior inconsistent statement.

is that the trial court erred in not instructing the jury on the lesser-included offense of assault. We affirm.[3]

## I.

The evidence showed that ever since a fall taken by Mrs. Baylor during an out-of-town trip in October 1976, she experienced swelling in her back, was continuously in pain, and drank between a pint and a quart of vodka almost every day to ease the pain. Appellant acknowledged he knew his wife had "a lot of pain" but stated he "didn't think she was sick." Because of her heavy drinking, Mrs. Baylor developed cirrhosis of the liver.

During the early afternoon of Sunday, February 6, 1977, the Baylors were conversing, drinking, and listening to music in their apartment with a neighbor. At one point Mrs. Baylor suddenly poured wine into appellant's beer. The neighbor, testifying for the defense, stated appellant sounded "irritated" when this happened. Appellant then struck his wife in the side, causing a two-inch laceration in her spleen. One medical witness testified that a spleen rupture such as this can be caused only by "a severe blow" such as someone "getting hit with a baseball bat, . . . a hockey stick, . . . a baseball, or a metallic object," or getting "kicked" or "struck . . . with any object [or] fist." He denied that a mere tap to the side would be sufficient to rupture a spleen. Although appellant attempted to show on cross-examination that a spontaneous or delayed rupture to the spleen might occur without severe force being applied, the medical witness disagreed.[4]

After being struck, Mrs. Baylor experienced severe pain. An ambulance had to be called twice before it arrived at 1:45 p. m.

The timing of events after her arrival at the Washington Hospital Center is unclear. Mrs. Baylor spent an undisclosed amount of time in the waiting room. Some time later an abdominal tap was performed in the emergency room, which showed internal bleeding. The diagnosis was not produced until two hours after her admission to the emergency room. There was no indication of how long it usually takes to make such diagnoses.

A surgeon was called to operate on Mrs. Baylor "in the early evening hours." He arrived in about two minutes. At about 6 p. m., the surgeon, together with the resident doctor and an intern, operated on Mrs. Baylor "to explore . . . for a ruptured intra-abdominal viscus." She was already in shock from loss of blood at the time of the operation and was rated a poor risk for surgery. This rating was due to shock, blood loss, cirrhosis of the liver, her history of heavy alcohol intake, and her elevated alcohol level when she entered the hospital.

The doctors discovered a recent two-inch laceration in Mrs. Baylor's spleen and approximately two quarts of fresh blood in her abdominal cavity, and they removed her spleen. There was testimony that a ruptured spleen will not heal itself in time to prevent the patient from hemorrhaging to death, that it cannot be repaired by surgery, and that it must be removed or else the patient will almost invariably bleed to death. There was also testimony that the spleen is a "dispensable organ [ ]," like an appendix.

After the spleen was removed, the doctors discovered a laceration in the tail of the pancreas, and so they removed that part of this organ. The operating surgeon stat-

---

**3.** Appellant's last two contentions are without merit. While the medical examiner's testimony might well have been admitted, no substantial error resulted. The fact is this evidence had already been admitted in the prior testimony of the operating surgeon. As to the last contention, it appears from the record that no request for an assault instruction was made at trial. We limit our discussion to appellant's first contention.

**4.** The medical witness stated that a spontaneous or delayed rupture could only occur if the spleen were diseased or had a subscapular hematoma caused by previous trauma, or if the patient were suffering from certain diseases such as malaria or mononucleosis. He testified that there was no indication of any of these diseases in Mrs. Baylor or signs of a delayed rupture.

ed that the pancreas is located "right underneath the spleen" and that it might have been injured either "the same time the spleen was injured" or "with a retractor while we were going up trying to mobilize the spleen." He could not be certain of the cause, he stated, because the pancreas could not be seen until the spleen had been removed. The medical examiner who testified also expressed the opinion that the pancreas was injured either by surgery necessary to save life or by the original blunt force trauma to the abdomen area.

The surgeon explained that a retractor or clamp is used in removing the spleen because of the spleen's close proximity to the pancreas. Moreover, he stated that he had removed perhaps a hundred spleens and that the pancreas is not infrequently injured or "traumatized" by retractors during removal of the spleen. There was testimony that a surgeon is very careful when he gets close to the pancreas since it is very susceptible to injury, and there was no testimony that the surgeons here were careless or negligent.

After surgery Mrs. Baylor's condition continued to deteriorate. The day after the operation she developed shocked lung and was placed on a respirator. This developed into bronchopneumonia. Her clotting mechanism, kidneys, and heart failed. There was testimony that all these complications related back to her poor preoperative condition and having to undergo surgery.

Other complications also resulted from the injury to Mrs. Baylor's pancreas. Pancreatitis developed, which caused body fat to be digested by enzymes secreted from the pancreas. This led to peripancreatic abscesses, or accumulation of dead fat tissue. A second operation was performed on February 15. Although appellant contends in his brief that this second operation was necessary to correct the injury to the pancreas, the only testimony in the record relating to this operation is that the purpose was to search for the cause of an infection that had set in.

The cause of death was not disputed. On February 19 Mrs. Baylor experienced cardiac arrest and died. In the medical examiner's opinion, cause of death was "bronchopneumonia and peripancreatic abscess resulting from or due to a blunt injury to her abdomen." It was stated by the operating surgeon that had Mrs. Baylor been operated on immediately and had there been no injury to her pancreas, her chances of survival would have been good, in his opinion.

The trial judge told the parties he would instruct on manslaughter as a lesser-included offense would give the standard jury instruction in this jurisdiction on causation. Unfortunately, the instructions actually given are not transcribed in the record on appeal. The standard instruction on causation reads as follows:

> One who inflicts an injury which starts a chain of causation leading to the death of another is held responsible for his death, although it may appear that the deceased might have recovered if he had received proper care, or that improper treatment or lack of care aggravated the injury and contributed to the death. Thus, if you find beyond a reasonable doubt that the death of the deceased was a result of an injury inflicted on him by the defendant, even though you may believe the deceased would not have died but for the lack of proper care, and the Government has proved beyond a reasonable doubt all the other elements of the offense, you may find the defendant guilty of murder in the second degree or manslaughter. [Criminal Jury Instructions for the District of Columbia, No. 4.27 (3d ed. 1978).]

During closing argument, appellant's counsel attempted to argue that Mrs. Baylor would not have died had she "gotten the kind of care that she was entitled to, . . . the kind of care that some people do get." The government objected, and the trial court stated:

> Ladies and gentlemen, if this person died because of negligence of the hospital, that's totally irrelevant to your decision.

So do not pursue that further, counsel.

As a matter of law negligence by the hospital, if it occurred, does not excuse the defendant's conduct in any way.

## II.

In this jurisdiction the case of *Hopkins v. United States,* 4 App.D.C. 430 (1894), established the rule that where the victim dies from a wound wrongfully inflicted by the defendant, the victim's failure to obtain medical treatment for the injury is no defense to homicide, even if he would have lived had proper medical care been obtained. More recently, in *United States v. Hamilton,* 182 F.Supp. 548 (D.D.C.1960), the victim was severely beaten, knocked down, and repeatedly kicked in the face by the defendant. The victim was taken to the hospital and treated. After being left alone in his hospital room, the victim removed the tubes which had been inserted into his nasal passages and trachea to facilitate breathing, and he died one hour later of asphyxiation. The District Court rejected the argument that the victim's own act which contributed to his death was a defense to homicide:

It is well established that if a person strikes another and inflicts a blow that may not be mortal in and of itself but thereby starts a chain of causation that leads to death, he is guilty of homicide. This is true even if the deceased contributes to his own death or hastens it by failing to take proper treatment.

\* \* \* \* \* \*

[E]ven if it were to be assumed, *arguendo,* that the deceased might have lived if he had not pulled out the tubes, this circumstance would not have any effect on the liability and responsibility of the defendant for the death of the deceased. [182 F.Supp. at 550–51.]

5. Annot., 100 A.L.R.2d 769, 773 (1965) (footnotes omitted).

6. Annot., 100 A.L.R.2d 769, 773 (1965) (footnote omitted; emphasis supplied).

■ As to intervening *medical treatment,* the general rule in most jurisdictions has been stated as follows:

[O]ne who has inflicted a wound or injury upon another is criminally responsible for his death, notwithstanding that different or more skillful medical treatment might have saved his life, or that death was immediately caused by a surgical operation rendered necessary by the . . . wound or injury.[5]

*See, e. g., State v. Sauter,* 120 Ariz. 222, 585 P.2d 242, 243 (1978); *State v. Cox,* 82 Idaho 150, 351 P.2d 472, 475 (1960); *State v. Richardson,* 197 Wash. 157, 84 P.2d 699, 702 (1938). Moreover:

[O]n the theory that *negligent* medical treatment . . . is a foreseeable consequence of his act, . . . the basic rule is that where a person inflicts upon another a dangerous wound, that is, one calculated to endanger or destroy life, it is no defense to a charge of homicide that death was contributed to by or immediately resulted from unskillful or improper treatment of the wound by attending physicians or surgeons.[6]

*See Smith v. State,* 54 Ala.App. 237, 307 So.2d 47, 50 (1975); *People v. McGee,* 31 Cal.2d 229, 240, 187 P.2d 706, 712–13 (1947); *People v. Dilworth,* 274 Cal.App.2d 27, 78 Cal.Rptr. 817, 820 (1969), *cert. denied,* 397 U.S. 1001, 90 S.Ct. 1148, 25 L.Ed.2d 411 (1970); *State v. Tomassi,* 137 Conn. 113, 75 A.2d 67, 70 (1950); *Wright v. State,* Del., 374 A.2d 824, 828 (1977); *State v. McClain,* 256 Iowa 175, 125 N.W.2d 764, 772 (1964); *Tibbs v. Commonwealth,* 138 Ky. 558, 128 S.W. 871, 873–74 (1910); *DeVaughn v. State,* 232 Md. 447, 194 A.2d 109, 113 (1963), *cert. denied,* 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964); *People v. Flenon,* 42 Mich.App. 457, 202 N.W.2d 471, 474 (1972); *State v. Richardson, supra;* R. Perkins, Criminal Law 716, 717 (1969).[7]

7. As stated in *People v. Flenon, supra:* "Since humans are not infallible, a doctor's negligence is foreseeable and cannot be used by a defendant to exonerate himself from criminal liability." 42 Mich.App. at 462, 202 N.W.2d at 474.

The exception to this rule is stated: "[I]t is generally recognized that *gross maltreatment* of the wound, which was the *sole cause of death,* is available as a defense to a charge of homicide, because the wound was not the proximate cause of death."[8] *See, e. g., People v. McGee, supra,* 31 Cal.2d at 240, 187 P.2d at 713; *People v. Flenon, supra,* 42 Mich.App. at 461, 202 N.W.2d at 474; *People v. Stewart,* 40 N.Y.2d 692, 389 N.Y.S.2d 804, 808, 358 N.E.2d 487, 491–92 (1976); Focht, *Proximate Cause in the Law of Homicide,* 12 S.Cal.L.Rev. 19, 34 (1938).

A dangerous wound is one from which a victim would have died without treatment. Ordinarily expert medical testimony will be required to show that the wound was not dangerous or calculated to produce death. *Wright v. State, supra,* 374 A.2d at 828, 829. In determining whether gross negligence was the "sole cause" of death, the test is generally whether, when death occurred, the original wound contributed substantially to the event. *See In re J. N.,* D.C.App., 406 A.2d 1275, 1286 (1979); *Crews v. State,* 44 Ga.App. 546, 162 S.E. 146, 149 (1932); *State v. McClain, supra,* 356 Iowa at 189, 125 N.W.2d at 772; *Pettigrew v. State,* 554 P.2d 1186, 1193 (Okl.Cr.App. 1976); *Pitts v. State,* 53 Okl.Cr. 165, 168, 8 P.2d 78, 79 (1932); Focht, *supra* at 34.

In the present case the government's evidence showed a dangerous wound, one calculated to endanger or destroy life. Appellant knew of his wife's drinking and health problems, and the medical testimony showed that a severe blow was given to the abdomen area, like someone "getting hit with a baseball bat." Had appellant actually used a baseball bat there would be no difficulty finding a wound calculated to endanger life, and we see no material difference where a hand or fist is used with the same amount of force. Moreover, the evidence was undisputed that without prompt medical attention Mrs. Baylor would have died from hemorrhage.

There was no evidence sufficient to submit the question of gross negligence

in medical treatment to the jury with instructions. Neither the cause nor circumstances of the hospital delay was explained. Moreover, the length of delay was not so extreme as to support a finding of gross negligence by itself. As to the possibility that the surgeons lacerated Mrs. Baylor's pancreas with retractors while removing her spleen, the expert testimony was that surgeons use either a retractor or a clamp when removing the spleen, and that this procedure not infrequently traumatizes the pancreas. There was no indication that use of a retractor is improper, considering that the spleen must be removed to save life, or that trauma to the pancreas is a sign of unskilled surgery, considering the close proximity of the two organs. Nor could such an inference be drawn by a jury of laymen based simply on these facts. As in the rule in civil malpractice cases:

> Where laymen can say, as a matter of common knowledge and observation, that the type of harm would not ordinarily occur in the absence of negligence, the jury is allowed to infer negligence without expert testimony being presented. However, if a case involves the merits and performance of scientific treatment, complex medical procedures, or the exercise of professional skill and judgment, a jury will not be qualified to determine whether there was unskillful or negligent treatment without the aid of expert testimony. [*Harris v. Cafritz Memorial Hospital,* D.C.App., 364 A.2d 135, 137 (1976) (citations, footnotes omitted), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).]

It has also been stated: "Allowing a jury to make its own inferences from the proven facts may be permissible when a physician has committed a blunder so egregious that a layman is capable of comprehending its enormity." *Haven v. Randolph,* 161 U.S. App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974). The need for expert testimony to aid the jury's understanding of the factual questions should be the same in a criminal case for the same reasons and in the inter-

---

8. Annot., 100 A.L.R.2d 769, 774 (1965) (footnote omitted; emphasis supplied).

est of prudence. The surgeon's handling of the pancreas was a technical matter, well beyond the experience of most jurors. Even if the injury to the pancreas were assumed to have occurred during surgery, the conduct of the surgeons would not have been so egregious that negligence was obvious to laymen. The absence of expert testimony indicating gross negligence in medical treatment precluded submission of the issue to the jury. *In re J. N., supra,* 406 A.2d at 1280. *See also Wright v. State, supra,* 374 A.2d at 829 (expert testimony ordinarily required to show wound not dangerous); *People v. Kane,* 213 N.Y. 260, 107 N.E. 655, 657 (1915) (medical testimony required to support jury finding that medical treatment caused victim's death).

██ Even had appellant shown gross negligence in the delay and in handling the pancreas, which he did not, the fact would remain that the government showed the initial wound contributed substantially to death. One of the immediate causes of death—bronchopneumonia—was a direct result of Mrs. Baylor's pre-existing physical condition, her severe blood loss, her having gone into shock, and undergoing the surgery necessary to save her life. While delay may have contributed to these events, it was not the sole cause of them. Appellant introduced no evidence disputing the chain of causation or the testimony that bronchopneumonia was operative as an immediate cause of death. His contention on appeal that the trial court should have allowed the jury to decide "whether . . . the injury to the pancreas produced the pancreatitis from which Mrs. Baylor died" begs the question and is without merit. There was no evidence that Mrs. Baylor died solely from peripancreatic abscess or pancreatitis.

In his reply brief appellant requests "a new trial at which he will have the opportunity to present to the jury evidence upon which they may, under proper instructions," decide whether medical malpractice was the cause of Mrs. Baylor's death. Had appellant proffered evidence relevant to show death solely from grossly negligent medical treatment, which evidence was then exclud-

ed by the trial court, there would be a different question. However, the record shows that no such evidence was proffered. We conclude that on the evidence presented the trial court's rulings and instructions were proper.

*Affirmed.*