Filed 12/22/14  P. v. Ramos CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FABIAN GONZALES RAMOS,<br><br>    Defendant and Appellant. | G050246<br><br>(Super. Ct. No. RIF10003660)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside, Elisabeth Sichel, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Linh Lam, and Scott Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Fabian Gonzales Ramos appeals from a judgment after a jury convicted him of voluntary manslaughter and found true he personally used a deadly weapon. Ramos argues the following: (1) the trial court erred in not submitting the proximate causation issue to the jury; (2) the court erred in limiting cross-examination of the medical examiner on causation; and (3) the court erred in instructing the jury on causation. None of his contentions have merit, and we affirm the judgment.

## FACTS

One summer evening, Manuel Lara was drinking beer at a body shop operated by his friend, Flavio Vallejo. Ramos drove up and got out of his vehicle; he worked at the shop and wanted to discuss his schedule with Vallejo. Ramos walked towards Lara and "complain[ed] about something." Ramos punched Lara. Lara threw a beer can at Ramos and kicked him. Ramos and Lara fought—they punched and kicked each other for a couple minutes. Ramos reached towards his back, pulled a knife out, and stabbed Lara in the abdomen. Ramos got back in his vehicle, and as he drove away, Lara smashed his windshield with a piece of wood.

Lara approached Juan Rosales and said, "He stabbed me." When Rosales saw the stab wound, he told Lara to go to the hospital. Lara called his friend, Martha Perez, who drove him to the hospital; Perez saw intestine protruding from the stab wound. The next morning, Perez picked up Lara from the hospital, drove him home, and cared for him, checking on him throughout the morning.

That afternoon, Irma Olivares, Lara's landlord, visited him. Lara was vomiting, and Olivares offered to take him to the hospital. She left him about 10:00 p.m. Olivares checked on Lara about 1:00 a.m. He did not respond, and she called 911. Paramedics responded and pronounced Lara dead. A toxicology report showed Lara had 0.04 percent blood alcohol in his system.

An information charged Ramos with murder (Pen. Code, § 187, subd. (a)) (count 1), and alleged he personally used a deadly and dangerous weapon, a knife (Pen. Code, §§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)).

Before trial, the prosecutor filed a trial brief, which included in limine motions. As relevant here, the prosecutor moved to exclude evidence of any negligence in treating Lara's wound. The issue was litigated at an Evidence Code section 402 hearing before trial.

Defense counsel argued it was for the jury to decide whether Ramos's conduct was a substantial cause of Lara's death or whether medical malpractice was an intervening cause of death relieving Ramos of criminal liability. Counsel referred the trial court to CALCRIM No. 620. Counsel argued the alleged negligence was that doctors concluded Lara suffered a superficial injury and they failed to treat him properly—they did not perform an exploratory surgery. Counsel relied on pathologist Dr. Mark Fajardo's statement "the hospital should have done exploratory surgery." Counsel asserted the cause of death was septic shock because Lara's intestine was not properly sutured. Counsel asserted Fajardo "came a hair shy of basically saying it was medical malpractice . . . ."

The prosecutor contended counsel overstated Fajardo's conclusions. The prosecutor explained Fajardo concluded that if doctors would have seen the injury, they could have "potentially" saved his life. The court characterized defense counsel's argument as a failure to act rather than a positive act. The court opined the failure to treat cannot be a superseding cause "by definition" because it means Ramos's criminal conduct was a substantial factor in Lara's death. Defense counsel repeated it was a factual issue for the jury. The court stated there had to be evidence supporting that theory, and it would research the issue.

After a short recess, the trial court explained, "the superseding cause is relevant only if it is so unforeseeable, extraordinary, and abnormal that it exonerates

3

[Ramos]." The court added the first inquiry was "whether the death would have occurred as a direct result of the wound absent some intervention." The court reasoned that like in *People v. McGee* (1947) 31 Cal.2d 229 (*McGee*), the issue was one of an absence of treatment, which that court held was not an intervening force and thus was not a superseding cause. Defense counsel inquired whether he would be permitted to cross-examine Fajardo on the issue of causation. Citing to *McGee*, the court said counsel had "to make a solid offer of proof" that "medical negligence was a supervening cause as a matter of law." Counsel argued that would violate Ramos's Sixth Amendment rights. The court stated counsel could question Fajardo about the cause of death but could not offer evidence or argue medical malpractice caused the death. The court added counsel could ask "whether the wound in and of itself, if untreated, was sufficient to have killed [Lara]." Counsel stated he should be permitted to ask Fajardo if Lara could have survived the wound without medical intervention. The court answered the correct inquiry was whether Ramos "set in motion a chain of events which would have led to [Lara's] death." After the court afforded defense counsel ample opportunity to make his arguments and prepare a record, the court denied counsel's request because he had not made a sufficient offer of proof. The court repeated that counsel could inquire about the cause of death and whether the infection was a result of the wound.

At trial, the prosecutor offered the testimony of Fajardo, the chief forensic pathologist of Riverside County, who conducted Lara's autopsy. Fajardo stated Lara had a one-inch stab wound to the abdominal cavity that punctured the intestine and caused fecal matter to flow into the abdominal cavity. He stated this resulted in peritonitis, an infection to the abdominal wall and intestines where bacteria infects the blood and causes septic shock. Fajardo opined the cause of death was a stab wound to the abdomen.

On cross-examination, Fajardo stated the stab wound was never sutured closed. Defense counsel asked whether there was anything doctors could have done that could have affected the size of the wound. The trial court sustained the prosecutor's

4

relevance objection. When counsel asked whether there was anything medically related that could change the wound's appearance, Fajardo answered "poking around in there." A little later, counsel asked whether the stab wound would have been survivable without any treatment. The court overruled the prosecutor's relevance objection. Fajardo answered: "Usually not. Usually you need some treatment to close up that hole in the intestine. It doesn't usually close up on itself. It can. It's a rare time when that happens. So most circumstances require that incision to the small intestine to be closed."

Ramos testified on his own behalf. Ramos testified that about a year before the incident, Luna pointed a gun at him and threatened to kill him. Ramos said Luna threatened to kill him and his family if he reported Ramos to the police and repeatedly harassed him. Ramos admitted he stabbed Luna, but he claimed it was in self-defense because Luna had a "jack handle."

The jury acquitted Ramos of first and second degree murder but convicted him of voluntary manslaughter and found true he personally used a deadly weapon. The trial court sentenced Ramos to the lower term of three years in part because "the medical malpractice by the treating hospital was also causal in the death of [Luna]." The court imposed a consecutive one-year term on the personal use of a deadly weapon enhancement. Ramos's total prison term was four years.

DISCUSSION

Ramos's three claims all involve the trial court's exclusion of evidence of alleged "medical malpractice." We will address each in turn.

*I. Admission of Evidence*

Ramos argues the trial court erred in excluding evidence of medical malpractice, i.e., an intervening cause of Lara's death was the failure to perform exploratory surgery, which resulted in not submitting the causation issue to the jury. We disagree.

5

In *McGee, supra,* 31 Cal.2d at pages 235, 241, defendant shot the victim, who was later taken to the hospital. Doctors operated on him approximately 10 hours later, but he died approximately seven hours after surgery. At trial, defendant moved to introduce a medical expert's testimony, which defendant argued would have tended to establish the proximate cause of the victim's death was not the bullet wound but his medical treatment. The trial court denied the motion. (*Id*. at p. 240.) The California Supreme Court concluded defendant was not prejudiced by the ruling because the proffered testimony "would not, as a matter of law, have been sufficient to show a supervening cause of death which would relieve defendant from criminal responsibility for the death of [the victim]." (*Id.* at p. 243.)

The *McGee* court explained: "'When a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide.'" (*McGee, supra,* 31 Cal.2d at p. 240.) Further, if "the wound inflicted by the accused operates as a cause of death, the fact that the malpractice of attending surgeons may have had some causative influence will not relieve the accused from full responsibility for the ultimate result of his act." (*Ibid*.) The court added, however, that if "'a person inflicts on another a wound not in itself calculated to produce death, and the injured person dies solely as a result of the improper treatment of the wound by an attending physician or surgeon, the fact that the death was caused by medical mistreatment is a good defense to a charge of homicide.'" (*Ibid*.) The *McGee* court concluded: "But defendant cannot complain because no force intervened to save him from the natural consequence of his criminal act. The factual situation is in legal effect the same, whether the victim of a wound bleeds to death because surgical attention is not available or because, although available, it is delayed by reason of the surgeon's gross neglect or incompetence. The delay in treatment is not in fact an intervening force; it cannot in law amount to a supervening cause." (*Id*. at p. 243.)

In *People v. Roberts* (1992) 2 Cal.4th 271, 294-295 (*Roberts*), defendant was charged with the murder of a fellow prison inmate. At trial, defendant sought to prove the stabbing was not the proximate cause of the victim's death as there was evidence that tended to establish the victim was "relatively well physically on arrival at the prison clinic and died as a result of incompetent medical care." (*Id*. at p. 296.) On appeal, defendant contended the jury instruction erroneously "failed to alert the jury it must decide whether the possibly substandard treatment of [the victim] was foreseeable." (*Id*. at p. 312.) Relying on *McGee*, the California Supreme Court disagreed, stating: "If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. [Citations.] To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause." (*Roberts, supra,* 2 Cal.4th at p. 312.) The *Roberts* court rejected defendant's claim the trial court erroneously failed to instruct the jury regarding intervening acts, noting there was no evidence of grossly improper medical treatment in that case. (*Id*. at pp. 312-313; *People v. Stanley* (2006) 39 Cal.4th 913, 946 (*Stanley*) ["[i]f a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death"]; *People v. Scott* (1997) 15 Cal.4th 1188, 1215 [when medical treatment grossly improper it may discharge liability for homicide if maltreatment is sole cause of death and thus unforeseeable intervening cause].)

In *People v. Funes* (1994) 23 Cal.App.4th 1506, 1510 (*Funes*), the victim suffered severe injuries and eventually died after his head was "smashed by a blunt object." Defendant claimed that a medical decision to withhold antibiotics arguably constituted an independent intervening cause of the victim's death, and the trial court erred in refusing to instruct the jury pursuant to a requested special instruction on proximate causation. (*Id*. at pp. 1522-1523.) Relying on *Roberts*, the *Funes* court rejected defendant's claim, explaining: "Although our Supreme Court has not addressed

7

this issue, it has determined that merely inadequate medical treatment is not an independent intervening cause, while 'grossly improper' medical treatment may constitute an independent intervening cause if it 'is the sole cause of death and hence an unforeseeable intervening cause.' [Citation.]" (*Funes, supra,* 23 Cal.App.4th at p. 1524, fn. 9; *People v. Autry* (1995) 37 Cal.App.4th 351, 361 (*Autry*) [citing *McGee* defendant cannot complain no force intervened to save him from consequences of his criminal act].)

Here, similar to *McGee* and its progeny, Ramos offered no evidence Lara's medical treatment was grossly improper, or even if it was, that it was the *sole* cause of Lara's death. Defense counsel made no offer of proof Lara's medical treatment was grossly improper and thus an unforeseeable intervening cause of his death. In fact, the record establishes Ramos's act of stabbing Lara set in motion the circumstances leading to Lara's death and the stabbing was a substantial factor contributing to his death. Fajardo, the doctor who performed Lara's autopsy, confirmed his death was a direct, natural, and probable consequence of Ramos's conduct. Fajardo explained the one-inch stab wound to Lara's abdominal cavity punctured the intestine, caused fecal matter to flow into the abdominal cavity, and resulted in septic shock. Fajardo stated such an injury is "usually not" survivable without medical treatment. Fajardo opined Lara died from a stab wound to the abdomen. Under these circumstances, there was no showing of gross negligence. As a matter of law, the alleged deficient treatment of Lara was not the sole cause of his death. (*McGee, supra,* 31 Cal.2d at p. 243 [defendant cannot complain no force intervened to save him from natural consequence of his criminal conduct].)

Ramos's claim the trial court erred in using the incorrect test for causation, the "but for" test instead of the "substantial factor" test, is belied by the record. The court correctly considered whether "the superseding cause is relevant only if it is so unforeseeable, extraordinary, and abnormal that it exonerates [Ramos]." Additionally, the fact Lara did not return to the hospital on his own accord does not relieve Ramos of the foreseeable consequences of his criminal conduct. (*Autry, supra,* 37 Cal.App.4th at

8

p. 360 [victim's contributory negligence does not relieve criminal actor of liability unless victim's conduct sole cause of death].)  Finally, the fact the court mentioned "medical malpractice" as a mitigating circumstance in imposing the lower term does not compel the conclusion the evidence was admissible at trial.  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 978 [trial court wide discretion in sentencing and may consider offense and defendant's attitude about offense and demeanor at trial].)  Thus, the court appropriately excluded Fajardo's testimony concerning alleged medical malpractice.

## II.  *Cross-Examination*

In a related claim, Ramos contends the trial court deprived him of his Sixth Amendment right to confrontation and to present a defense when it ruled he could not cross-examine Fajardo on "medical malpractice."  To support his claim, Ramos relies on defense counsel's question whether there was anything doctors could have done that could have affected the size of the wound.  Ramos's claim is essentially the same as his first argument couched as a constitutional argument.

As we explain above, the parties litigated the issue at an Evidence Code section 402 hearing.  At that hearing, Ramos was unable to make an offer of proof Lara's medical treatment was the sole cause of his death.  Without an adequate offer of proof "medical malpractice" was the sole cause of Lara's death, the court properly limited counsel's cross-examination of Fajardo.  It is well settled a trial court had wide latitude to impose reasonable limits on cross-examination based on well-established principles of the Evidence Code.  (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; *People v. Harris* (1989) 47 Cal.3d 1047, 1091.)  Additionally, Ramos was not denied the opportunity to present a defense when the evidence he sought to offer was not relevant.  (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428 [ordinary rules of evidence do not infringe on defendant's right to present defense].)  Thus, Ramos's constitutional claims have no merit.

9

*III. Jury Instructions*

Recognizing the trial court instructed the jury on causation principles as they relate to murder, Ramos asserts the court erred in failing to instruct the jury with CALCRIM Nos. 620, "Causation: Special Issues," and 240, "Causation" because had the jury heard evidence about medical malpractice, it could have concluded grossly improper medical treatment was a substantial factor in Lara's death. The Attorney General contends Ramos forfeited appellate review of this issue and, in any event, the court had no sua sponte duty to give the jury those instructions. We disagree with the Attorney General that Ramos forfeited this issue but agree the trial court did not err.

The Attorney General's forfeiture argument hits far wide of the mark. We suspect Ramos did not request those instructions because the trial court had previously ruled he could not offer evidence medical malpractice was an unforeseeable intervening cause of Lara's death. There would be no reason for Ramos to request those instructions because as Ramos concedes in his reply brief, "the jury did not hear potentially exculpatory evidence about other causes of death."

As to the merits, the trial court did not err in failing to instruct the jury sua sponte with CALCRIM Nos. 620 and 240. Ramos's concession the jury did not hear evidence of other causes of death dooms his argument, which at its core is another attempt to attack the trial court's pre-trial ruling he could not offer evidence medical malpractice was a substantial factor in Lara's death. As we explain above more fully, grossly improper medical treatment may discharge liability for homicide if the malpractice is the sole cause of death and hence an unforeseeable intervening cause. Here, though, Ramos did not make an offer of proof grossly improper medical treatment was the sole cause of Lara's death. And because Ramos failed to offer any evidence grossly improper medical treatment was the sole cause of Lara's death, the trial court was not required to instruct the jury sua sponte with CALCRIM Nos. 620 and 240. (*Stanley, supra,* 39 Cal.4th at p. 946 [trial court properly refused pinpoint instruction where

10

evidence established victim died from defendant's criminal act and edema was medically foreseeable]; *Roberts, supra,* 2 Cal.4th at pp. 311-313 [trial court properly refused modified proximate cause instruction because no evidence of grossly improper care]; *Autry, supra,* 37 Cal.App.4th at pp. 360-362 [trial court properly refused causation instructions where no evidence absence of safety precautions sole cause of accident]; *Funes, supra,* 23 Cal.App.4th at pp. 1522-1524 [trial court properly refused special instruction on proximate cause where no evidence of independent intervening cause].) Thus, the trial court gave the proper jury instructions.

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.


11